J-A12014-14

2014 PA Super 241

| | | |
|---|---|---|
| COLLEEN M. KRAUSS, EXECUTOR OF THE ESTATE OF HENRY M. KRAUSS, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| TRANE US INC., f/k/a AMERICAN STANDARD, et al; ALLIS-CHALMERS CORPORATION; AQUA CHEM, INC., d/b/a CLEAVER BROOKS DIVISION, INDIVIDUALLY AND SUCCESSOR IN INTEREST TO SPRINGFIELD BOILERS; AVENTIS CROPSCIENCE USA, INC., a/k/a AMCHEM PRODUCTS INC., now known as BAYER CROPSCIENCE INC., f/k/a BENJAMIN FOSTER CO., c/o CORPORATION SERVICES CO.; A.W. CHESTERTON CO.; BABCOCK POWER, INC., f/k/a BABCOCK BORSIG POWER INC., f/k/a D.B. RILEY STOKER CORPORATION; BONDEX INTERNATIONAL INC., c/o DANIEL J. RYAN, ESQUIRE; CRANE COMPANY; CROWN CORK AND SEAL COMPANY INC.; DURABLE MANUFACTURING COMPANY, INC.; ELLIOT TURBOMACHINERY COMPANY, a/k/a ELLIOT COMPANY; FOSTER WHEELER ENERGY CORPORATION; GARLOCK SEALING TECHNOLOGIES, LLC.; GEORGIA-PACIFIC CORPORATION, INDIVIDUALLY AND AS SUCCESSOR TO BESTWALL GYPSUM COMPANY; GOODRICH CORPORATION; GOULDS PUMPS INCORPORATED; GUARDLINE INC.; INDUSTRIAL HOLDINGS CORPORATION, f/k/a THE CARBORUNDUM COMPANY, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO LOCKPORT FELT, A DIVISION OF THE CARBORUNDUM COMPANY; INGERSOLL RAND | : | |

COMPANY; KAISER GYPSUM                     :
COMPANY, INC.; KCG INC., AS                :
SUCCESSOR IN INTEREST TO RUCO;             :
METROPOLITAN LIFE INSURANCE                :
COMPANY; MURCO WALL PRODUCTS,              :
INC.; OAKFABCO, INC., f/k/a                :
KEWANEE BOILER CORPORATION;                :
OWENS-ILLINOIS INC., INDIVIDUALLY          :
AND AS SUCCESSOR IN INTEREST TO            :
OWENS-ILLINOIS GLASS COMPANY;              :
RAPID-AMERICAN CORPORATION f/k/a           :
GLEN ALDENCORPORATION,                     :
INDIVIDUALLY AND AS SUCCESSOR-             :
BY-MERGER TO GLEN ALDEN                    :
CORPORATION, BRIGGS                        :
MANUFACTURING CO., PHILIP CAREY            :
CORPORATION AND PHILIP CAREY               :
MANUFACTURING COMPANY; RPM                 :
INC., AS SUCCESSOR TO REPUBLIC             :
POWDERED METALS, SUCCESSOR TO              :
BONDEX; SEPCO CORPORATION; THE             :
SHERWIN-WILLIAM COMPANY; T.H.              :
AGRICULTURE & NUTRITION LLC.;              :
UNION CARBIDE CORPORATION,                 :
INDIVIDUALLY AND f/k/a UNION               :
CARBIDE CHEMICALS AND PLASTIC              :
COMPANY, INC.; UNIROYAL HOLDING,           :
INC., AS SUCCESSOR TO UNITED               :
STATES RUBBER COMPANY; VIACOM,             :
INC., INDIVIDUALLY AND AS                  :
SUCCESSOR-BY-MERGER TO CBS                 :
CORPORATION, f/k/a WESTINGHOUSE            :
ELECTRIC CORPORATION; WICKES               :
CORPORATION, INDIVIDUALLY AND              :
AS SUCCESSOR BY MERGER TO                  :
WICKES BOILER CO.; ZURN                    :
INDUSTRIES INC., a/k/a AND AS              :
SUCCESSOR-BY-MERGER TO ERIE                :
CITY IRON WORKS; KELLY MOORE               :
PAINT COMPANY INC.; BORDEN                 :
CHEMICAL INC., f/k/a BORDEN                :
CHEMICAL COMPANY AND n/k/a                 :

HEXIO SPECIALTY CHEMICALS INC., :
PRENTICE HALL CORPORATION; :
CERTAIN-TEED CORPORATION f/k/a :
CERTAINTEED PRODUCTS :
CORPORATION; FORD MOTOR :
COMPANY; FREEPORT-McMORAN INC., :
f/k/a FREEPORT CHEMICAL COMPANY, :
AND SUCCESSOR TO AGRICO INC.; :
THE PEP-BOYS MANNY, MOE & JACK; :
A.P. GREEN a/k/a A.P. GREEN :
REFRACTORIES, INC., f/k/a A.P. :
GREEN REFRACTORIES COMPANY, :
AND A SUBSIDIARY OF ANH :
REFRACTORIES COMPANY; BENJAMIN :
FOSTER COMPANY, A DIVISION OF :
AMCHEM; HARBISON-WALKER, f/k/a :
HARBISON-WALKER REFRACTORIES :
COMPANY AND A SUBSIDIARY OF ANH :
REFRACTORIES COMPANY; KAISER :
ALUMINUM AND CHEMICAL :
CORPORATION, :
 : No. 644 EDA 2013
 Appellees

Appeal from the Orders Entered January 22 and 23, 2013,
In the Court of Common Pleas of Philadelphia County,
Civil Division, at No. 00726 January Term, 2007.

COLLEEN M. KRAUSS, EXECUTOR OF : IN THE SUPERIOR COURT OF
THE ESTATE OF HENRY M. KRAUSS, : PENNSYLVANIA
 :
 Appellant :
 :
 v. :
 :
CBS CORPORATION, et al; ANCO :
INSULATIONS, INC.; BORDEN :
CHEMICAL INC., f/k/a BORDEN :
CHEMICAL COMPANY AND n/k/a :
HEXION SPECIALTY CHEMICALS, INC., :
PRENTICE HALL CORPORATION; CBS :

CORPORATION; CERTAIN-TEED :
CORPORATION, f/k/a CERTAINTEED :
PRODUCTS CORPORATION; FORD :
MOTOR COMPANY; FREEPORT- :
McMORAN INC., f/k/a FREEPORT :
CHEMICAL COMPANY AND :
SUCCESSOR TO AGRICO INC.; :
GENERAL ELECTRIC COMPANY; :
GOULDS PUMPS INC.; THE PEP BOYS- :
MANNY, MOE & JACK; TRANE US INC., :
f/k/a AMERICAN STANDARD INC.; :
ZURN INDUSTRIES INC., a/k/a AND :
AS SUCCESSOR-BY-MERGER TO ERIE :
CITY IRON WORKS; A.P. GREEN a/k/a :
A.P. GREEN REFRACTORIES, INC., :
f/k/a A.P. GREEN REFRACTORIES :
COMPANY, AND A SUBSIDIARY OF :
ANH REFRACTORIES COMPANY; :
BENJAMIN FOSTER COMPANY, A :
DIVISION OF AMCHEM; HARBISON :
WALKER f/k/a HARBISON WALKER :
REFRACTORIES COMPANY AND A :
SUBSIDIARY OF ANH REFRACTORIES :
COMPANY; KAISER ALUMINUM AND :
CHEMICAL CORPORATION, :
 :
                    Appellees     :     No. 671 EDA 2013

Appeal from the Orders Entered January 22 and 23, 2013,
In the Court of Common Pleas of Philadelphia County,
Civil Division, at No. 00212 February Term, 2006.


BEFORE:  SHOGAN, STABILE and PLATT*, JJ.

OPINION BY SHOGAN, J.:                          **FILED OCTOBER 22, 2014**

Appellant, Colleen M. Krauss, Executrix of the Estate of Henry M.

Krauss ("Decedent"), appeals from the orders granting summary judgment

_____

*Retired Senior Judge assigned to the Superior Court.

in favor of Appellees General Electric Company ("GE"); Georgia-Pacific, L.L.C; CBS Corporation-Westinghouse ("Westinghouse"); Goulds Pumps, Inc.; Zurn Industries; and Trane US Inc., f/k/a American Standard ("American Standard"), (jointly "Appellee Manufacturers").[1]  We affirm.

The trial court summarized the factual and procedural history of this case as follows:

> Appellant Colleen M, Krauss, as [Executrix] of the Estate of Henry M. Krauss, commenced suit against twelve (12) defendants on February 7, 2006, under the caption Krauss v. Anco Insulations, Inc., et al, Philadelphia Court of Common Pleas February Term 2006, No. 212.  On January 8, 2007, Appellant filed a second suit against thirty-seven (37) additional defendants under the caption Krauss v. Allis Chalmers Corp., et al, Philadelphia Court of Common Pleas January Term 2007, No. 726.  Appellant filed a Motion to Consolidate the two actions on February 7, 2011, and the cases were consolidated under the February Term 2006, No. 212 court term and number by court Order dated May 13, 2011.
>
> Appellant Colleen M. Krauss contends Appellant's decedent, Henry M. Krauss, was employed in the bricklaying trade, and during the course of his employment, Mr. Krauss worked at various job sites throughout the state of Louisiana, including at Borden Chemical in Geimser, Kaiser Aluminum and Chemical Company in both Baton Rouge and Gramercy, Freeport Chemical in Convent, AgraCo in Donaldsville, and while in the employ of John Wayne Smith Masonry in Baton Rouge. Appellant claims Mr. Krauss also worked at Kirkland Masonry in Boca Raton, Florida.  According to Appellant, Mr. Krauss worked at these job sites between the years of 1978 and 1983 with each job varying in length.

---

[1] We note that Appellant also filed an appeal from the decision involving Foster Wheeler, L.L.C., but subsequently filed an application for leave to discontinue the appeal as to Foster Wheeler, L.L.C. on December 20, 2013. This Court granted that application on January 14, 2014.

Appellant claims Appellant's decedent was exposed to asbestos at numerous jobsites from working with and/or around Appellees' products, including turbines manufactured by Appellees General Electric and CBS Corporation (Westinghouse); boilers manufactured by Appellees Zurn Industries, Foster Wheeler, LLC and Trane US. Inc. f/k/a American Standard; pumps manufactured by Appellee Goulds Pumps, Inc., and joint compound and other spackling and adhesive products manufactured by Appellee Georgia[-]Pacific, LLC. Appellant claims while on the job the decedent[,] Mr. Krauss[,] got asbestos on his clothes and hair and in his lungs, and as a result he contracted mesothelioma. Appellant's decedent was not deposed before his death.

On November 13, 2012, all the Appellees filed Motions for Summary Judgment. Appellant filed Answers to the Motions for Summary Judgment of Appellees Georgia-Pacific, LLC; Foster Wheeler, LLC; CBS Corporation (Westinghouse); Goulds Pumps, Inc.; Zurn Industries and Trane US, Inc. f/k/a American Standard on November 30, 2012. Appellant filed an Answer to the Motion for Summary Judgment of Appellee General Electric Company on December 7, 2012. On January 16, 2013[, the trial court] granted summary judgment in favor of Appellee General Electric Company. On January 19, 2013[, the trial court] granted summary judgment in favor of Appellees Foster Wheeler, L.L.C.; Georgia-Pacific, LLC; CBS Corporation (Westinghouse); Goulds Pumps, Inc.; Zurn Industries and Trane US Inc. f/k/a American Standard.

On February 21, 2013, Appellant filed [her] Notices of Appeal of the aforementioned Orders. On February 28, 2013, [the trial court] issued Orders directing Appellant to file a Concise Statement of Matters Complained of on Appeal pursuant to [Pa.R.A.P.] 1925(b). On March 18, 2013, Appellant filed [her] 1925(b) Statements.

Trial Court Opinion, 10/10/13, at 1-3.[2]

---

[2] Appeal may be taken only from a final order that disposes of all claims and all parties. Pa.R.A.P. 341(a). The record reflects trial court docket entries on both dockets, dated January 28, 2013, noting that the cases were settled as to all remaining non-bankrupt parties, except the Manville Fund, but the

Appellant presents the following issues for our review:

    A.    DID THE LOWER COURT ERR AS A MATTER OF LAW WHEN IT GRANTED ALL SIX MOTIONS FOR SUMMARY JUDGMENT WHERE THE AFFIDAVIT OF MIKE MORGAN RAISES A GENUINE ISSUE OF MATERIAL FACT CONCERNING FREQUENT, REGULAR AND PROXIMATE EXPOSURE TO [] ASBESTOS PRODUCTS OF ALL SIX MANUFACTURERS?

    B.    DID THE LOWER COURT ERR AS A MATTER OF LAW WHEN IT GRANTED THE MOTION FOR SUMMARY JUDGMENT OF CBS CORPORATION WHERE THE RECORD REVEALS A GENUINE ISSUE OF MATERIAL FACT CONCERNING FREQUENT, REGULAR AND PROXIMATE EXPOSURE TO ASBESTOS IN TURBINES OF CBS CORPORATION'S ACKNOWLEDGED PREDECESSOR, WESTINGHOUSE?

    C.    DID THE LOWER COURT ERR AS A MATTER OF LAW WHEN IT GRANTED THE MOTION FOR SUMMARY JUDGMENT OF GENERAL ELECTRIC COMPANY WHERE THE RECORD REVEALS A GENUINE ISSUE OF MATERIAL FACT CONCERNING FREQUENT, REGULAR AND PROXIMATE EXPOSURE TO ASBESTOS IN TURBINES OF GENERAL ELECTRIC COMPANY?

    D.    DID THE LOWER COURT ERR AS A MATTER OF LAW WHEN IT GRANTED THE MOTION FOR SUMMARY JUDGMENT OF GEORGIA-PACIFIC WHERE THE RECORD REVEALS A GENUINE ISSUE OF MATERIAL FACT CONCERNING EXPOSURE TO GEORGIA-PACIFIC'S ASBESTOS-CONTAINING PRODUCTS?

---

case against the Manville Fund was dismissed without prejudice. Appellant asserts, despite this language, that Appellant and the Manville Fund, in fact, had settled. "A trial court order declaring a case settled as to all remaining parties renders prior grants of summary judgment final for Rule 341 purposes, even if the prior orders entered disposed of fewer than all claims against all parties." *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 650 (Pa. Super. 2002). In this case, all parties are now settled, bankrupt, or dismissed by grant of summary judgment or otherwise. Consequently, the grants of summary judgment for the Appellees identified herein are final orders for appeal purposes and the present appeal is properly within our jurisdiction. *Id.* at 650.

E.     DID THE LOWER COURT ERR AS A MATTER OF LAW WHEN IT GRANTED THE MOTION FOR SUMMARY JUDGMENT OF GOULDS PUMPS WHERE THE RECORD REVEALS A GENUINE ISSUE OF MATERIAL FACT CONCERNING FREQUENT, REGULAR AND PROXIMATE EXPOSURE TO ASBESTOS IN GOULDS PUMPS?

F.     DOES THE RECORD REVEAL GENUINE ISSUES OF MATERIAL FACT WHETHER DEFENDANTS CAN BE HELD LIABLE FOR THEIR INCLUSION OF THIRD PARTIES' ASBESTOS-CONTAINING PRODUCTS AS COMPONENTS IN THEIR OWN PRODUCTS?

G.     DID THE LOWER COURT ERR AS A MATTER OF LAW WHEN IT GRANTED THE MOTION FOR SUMMARY JUDGMENT OF TRANE WHERE THE RECORD REVEALS A GENUINE ISSUE OF MATERIAL FACT CONCERNING FREQUENT, REGULAR AND PROXIMATE EXPOSURE TO ASBESTOS IN AMERICAN STANDARD BOILERS?

H.     DID THE LOWER COURT ERR AS A MATTER OF LAW WHEN IT GRANTED THE MOTION FOR SUMMARY JUDGMENT OF ZURN WHERE THE RECORD REVEALS A GENUINE ISSUE OF MATERIAL FACT CONCERNING FREQUENT, REGULAR AND PROXIMATE EXPOSURE TO ASBESTOS IN ZURN BOILERS?

Appellant's Brief at 7-11 (verbatim).

An order granting summary judgment is subject to the following scope and standard of appellate review:

Our standard of review on an appeal from the grant of a motion for summary judgment is well-settled. A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving

party is entitled to relief as a matter of law, summary judgment may be entered. Where the nonmoving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

**Shepard v. Temple University**, 948 A.2d 852, 856 (Pa. Super. 2008) (quoting **Murphy v. Duquesne University**, 777 A.2d 418, 429 (Pa. 2001)).

Furthermore, our Courts have developed summary judgment standards specific to asbestos cases. In **Eckenrod v. GAF Corp.**, 544 A.2d 50, 52 (Pa. Super. 1988), this Court set forth the evidence an asbestos plaintiff must produce to establish a *prima facie* case sufficient to proceed to trial:

In order for liability to attach in a products liability action, plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier. Additionally, in order for a plaintiff to defeat a motion for summary judgment, a plaintiff must present evidence to show that he inhaled asbestos fibers shed by the specific manufacturer's product. Therefore, a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use. Summary judgment is proper when the plaintiff has failed to establish that the defendants' products were the cause of plaintiff's injury.

* * *

Whether direct or circumstantial evidence is relied upon, our inquiry, under a motion for summary judgment, must be

whether plaintiff has pointed to sufficient material facts in the record to indicate that there is a genuine issue of material fact as to the causation of decedent's disease by the product of each particular defendant. Whether a plaintiff could successfully get to the jury or defeat a motion for summary judgment by showing circumstantial evidence depends upon the frequency of the use of the product and the regularity of plaintiff's employment in proximity thereto.

*Id.* at 52-53 (citations omitted).

The **Eckenrod** "frequency, regularity, proximity" standard for determining whether a plaintiff has come forward with sufficient evidence to allow a jury to conclude reasonably that the plaintiff breathed some asbestos fibers from a defendant's product originally applied only to consideration of circumstantial, rather than direct, evidence. **See, e.g., Gilbert v. Monsey Products Co.**, 861 A.2d 275, 277 (Pa. Super. 2004) ("Because Appellant provided direct testimony [that he inhaled asbestos fibers from the defendant's product], the **Eckenrod** test was not applicable."). However, our Supreme Court later extended the application of the **Eckenrod** factors to **all** evidence of asbestos exposure:

Further, we find that the bright-line distinction that Appellee seeks to draw between direct and circumstantial evidence cases is not warranted, because this distinction is unrelated to the strength of the evidence and is too difficult to apply, since most cases involve some combination of direct and circumstantial evidence.

**Gregg v. V-J Auto Parts, Company**, 943 A.2d 216, 226 (Pa. 2007).

Additionally, in **Gregg**, our Supreme Court modified the "frequency, regularity, proximity" criteria previously enunciated by this Court in **Eckenrod**. Specifically, the Supreme Court adopted the approach utilized by the United States Court of Appeals for the Seventh Circuit in **Tragarz v. Keene Corp.**, 980 F.2d 411 (7th Cir.1992):

> The decision in **Tragarz v. Keene Corp.**, 980 F. 2d 411 (7th Circ. 1992), . . . provides helpful guidance concerning the application of the frequency, regularity and proximity factors in asbestos litigation. **Tragarz** explains that these criteria do not establish a rigid standard with an absolute threshold necessary to support liability. Rather, they are to be applied in an evaluative fashion as an aid in distinguishing cases in which the plaintiff can adduce evidence that there is a sufficiently significant likelihood that the defendant's product caused his harm, from those in which such likelihood is absent on account of only casual or minimal exposure to the defendant's product.

**Gregg**, 943 A.2d at 225.

Thus, our Supreme Court disapproved of the application of a rigid **Eckenrod** "frequency, regularity, proximity" test in every case, and instead adopted a new fact-specific sliding scale approach that includes two important considerations not part of the **Eckenrod** analysis:

> **Tragarz** suggests that the application of the test should be tailored to the facts and circumstances of the case, such that, for example, its application should become "somewhat less critical" where the plaintiff puts forth specific evidence of exposure to a defendant's product. Similarly, under **Tragarz**, the frequency and regularity prongs become "somewhat less cumbersome" in cases involving diseases that the plaintiff's competent medical

evidence indicates can develop after only minor exposures to asbestos fibers. [3]

***Gregg***, 943 A.2d at 225 (citing ***Tragarz***, 980 F.2d at 420-421) (internal citations omitted).

The ***Gregg*** Court also rejected the viability of the "each and every exposure" or "any breath" theory. It stated:

> [W]e do not believe that it is a viable solution to indulge in a fiction that each and every exposure to asbestos, no matter how minimal in relation to other exposures, implicates a fact issue concerning substantial-factor causation ... The result, in our view, is to subject defendants to full joint-and-several liability for injuries and fatalities in the absence of any reasonably developed scientific reasoning that would support the conclusion that the product sold by the defendant was a substantial factor in causing the harm.

***Id.*** at 226–27.

In summarizing its holding, the ***Gregg*** Court explained:

> In summary, we believe that it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury.

***Gregg***, 943 A.2d at 227.

---

[3] Mesothelioma is "a cancer of the mesothelial tissue surrounding the lung, which is a rare disease with the exception of those exposed to asbestos." ***Sporio v. W.C.A.B. (Songer Construction)***, 717 A.2d 525, 527 (Pa. 1998). Mesothelioma "is medically attributable specifically to exposure to asbestos or asbestine products." ***Gutteridge***, 804 A.2d at 652.

In ***Betz v. Pneumo Abex, LLC***, 44 A.3d 27, 30 (Pa. 2012), the Supreme Court specifically addressed the admissibility of expert opinion of the "any-exposure" or "any breath" theory of causation, which states, "each and every fiber of inhaled asbestos is a substantial contributing factor to any asbestos-related disease." ***Id.*** at 30. The ***Betz*** Court rejected the "any exposure" theory of causation, concluding it was theoretically "in irreconcilable conflict with itself." ***Id.*** at 56. As the Court explained: "one cannot simultaneously maintain that a single fiber among millions is substantially causative, while also conceding that a disease is dose responsive."[4] ***Id.*** Therefore, the ***Betz*** Court affirmed the trial court's decision to preclude the use of the "any exposure" theory of causation in asbestos cases. ***Id.*** at 58.

Additionally, in ***Howard v. A.W. Chesterton, Co.***, 78 A.3d 605 (Pa. 2013) (*per curiam*) (***Howard III***), our Supreme Court indicated that the following principles apply to all asbestos cases involving a dose-responsive disease: (1) the "theory that each and every exposure, no matter how small" is not viable to establish a defendant's liability; (2) proof of *de minimus* exposure to a product is insufficient to establish causation; (3) an expert must make "some reasoned, individualized assessment of a plaintiff's or decedent's exposure history" in opining about substantial-factor causation

---

[4] In ***Betz***, 44 A.3d at 31, the Court noted that all experts agreed that mesothelioma is a dose-responsive disease.

of the asbestos disease; and (4) summary judgment "is an available vehicle" for challenging *de minimus* exposure. **Howard III**, 78 A.3d at 608.

Mindful of the foregoing tenets, we turn to Appellant's claims. Appellant first contends that the affidavit of Michael A. ("Mike") Morgan, Decedent's former co-worker, is sufficient on its own to raise genuine issues of material fact concerning Decedent's frequent, regular, and proximate exposure to asbestos in products from all Appellee Manufacturers in this case. Appellant's Brief at 33. Appellant has attached this Affidavit to all of her responses to motions for summary judgment filed by the Appellee Manufacturers.

The affidavit in question provides, in its entirety, as follows:

I, Mike Morgan, being first duly sworn, depose and state as follows:

1) I knew and worked with Henry (Hank) Krauss in the bricklaying trade.

2) I worked with Hank Krauss at numerous job sites, including Borden Chemical in Geismer, Louisiana, Kaiser Aluminum and Chemical Company in Baton Rouge Gramercy, Louisiana, Freeport Chemical Convent, Louisiana and AgraCo in Donaldsville, Louisiana between 1978 and 1983. Each of these jobs lasted approximately one week or longer.

3) At our job sites there were boilers manufactured by **American Standard**, **Foster Wheeler** and **Zurn**.

4) We worked at sites where there were turbines manufactured by **General Electric** and **Westinghouse**.

5)    There were a number of products manufactured by **Georgia**[-]**Pacific** including joint compound and other adhesive products.

6)    We used **Kaiser Gypsum** cement, particularly at the Kaiser Aluminum and Chemical plants.

7)    I am familiar with **Goulds Pumps**.  Their large industrial pumps were at some of the facilities where Hank Krauss and I worked.

8)    All of the boilers, turbines and pumps were insulated with heat-resistant asbestos products to the best of my knowledge and belief.

9)    The use of all the above-mentioned products created a great deal of visible dust.  That dust got on our clothing, in our hair and in our lungs.  We breathed in that dust and were never given any warning that the inhalation of asbestos fibers could be hazardous to our health.

Further, the Affiant sayeth not.

"Exhibit A" to Plaintiff's responses to motions for summary judgment,

Affidavit of Mike Morgan, 10/17/12, at 1 (emphasis in original).

Our Supreme Court has stated the following with regard to lay witness

opinions as to the presence of asbestos:

Where . . . a party proffers a witness expressing an opinion on matters such as the presence of asbestos in the workplace, the trial court must be rigorous in assuring that the lay witness satisfies the strictures of Rule 701.  In particular, the proponent of technical lay opinion testimony must show that the testimony is based on sufficient personal experience or the specialized knowledge of the witness. Pa.R.E. 602. . . .  Without meeting the requirements of Rule 701, the lay opinion is not "rationally based on the perception of the witness" or truly "helpful" to the jury.

*Gibson v. Workers' Comp. Appeal Bd. (Armco Stainless & Alloy Prods.)*, 861 A.2d 938, 945 (Pa. 2004). Rule 701 of the rules of evidence further provides:

**Rule 701. Opinion Testimony by Lay Witnesses**

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.[5]

In his affidavit, Mr. Morgan boldly professed that he recalled all of these products being present at the various worksites where he worked with Decedent over the course of a five-year period, approximately twenty-nine

---

[5] We note that on January 17, 2013, and effective March 18, 2013, the Pennsylvania Rules of Evidence were rescinded and replaced. As set forth in the explanatory comments to the new rules, they now

closely follow the format, language, and style of the amended Federal Rules of Evidence. The goal of the Pennsylvania Supreme Court's rescission and replacement of the Pennsylvania Rules of Evidence was . . . to make its rules more easily understood and to make the format and terminology more consistent, but to leave the substantive content unchanged.

Explanatory Comments preceding the Pennsylvania Rules of Evidence, at ¶ 2.

to thirty-four years prior to executing the affidavit. Mr. Morgan's affidavit, however, provides no specific evidence that Decedent was exposed to a product manufactured by a particular manufacturer or supplier at a particular worksite.

Additionally, the affidavit fails to establish with any certainty that these products contained asbestos. Mr. Morgan's affidavit asserts that "all of the boilers, turbines and pumps" identified in his affidavit were insulated with asbestos products based on his "knowledge and belief." It, however, provides no **specific evidence** upon which he based his determination that these boilers, turbines, and pumps were insulated with asbestos products.[6]

In **Gibson**, the claimant presented testimony of a co-worker who testified that he had seen a substance that he "believed" to be asbestos at the factory where he and the claimant had worked. **Gibson**, 861 A.2d at 941. The Court determined that such testimony was insufficient to establish that asbestos existed in the workplace. **Id.** at 946. In addressing the shortcoming of the lay-witness testimony, the Court stated:

> The admissibility of lay opinion testimony is not without limit. Given the standard we articulate today for the admission of lay opinion evidence of a technical nature, we conclude that the [judge] failed to examine with sufficient rigor whether the testimony in question was informed by sufficient experience or specialized knowledge. More particularly, in order to satisfy the

---

[6] Further, although Mr. Morgan's affidavit asserts that he used joint compounds and other adhesive products manufactured by Georgia-Pacific, it makes no claim that these products contained asbestos.

"rationally derived" and helpfulness standards of Rule 701, Claimant needed to demonstrate that the witness possessed sufficient experience or specialized knowledge that qualified him to offer a technical opinion regarding the presence of asbestos in the workplace. While a lay witness could acquire this additional insight by either formal education or practical experience, it appears the witness at issue simply possessed neither.

Actual knowledge and observation on the part of the lay witness are the essential bases for the reception of the opinion. Pursuant to Rule 602, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Thus, we must agree . . . that the record is devoid of substantial evidence to support a finding of long-term asbestos exposure in the workplace.

*Id.* at 948.

Additionally, in ***Samarin v. GAF Corp.***, 571 A.2d 398, 404, 409 (Pa. Super. 1989), this Court held that a witness's testimony regarding a material's high heat application was insufficient to support the conclusion that the product contained asbestos. We noted that such facts simply created "an insufficient foundation for a jury to infer by a preponderance of the evidence that the heat resistant products used . . . contained asbestos." *Id.* at 403. Similarly, in ***Bushless v. GAF Corp.***, 585 A.2d 496, 503 (Pa. Super. 1990), we held that a statement that a person knew a product contained asbestos from his years of experience and because of the product's ability to withstand high temperatures was insufficient to create an issue of material fact that the product contained asbestos. Conversely, in ***Harahan v. AC & S, Inc.***, 816 A.2d 296, 298 (Pa. Super. 2003), the lay

opinion of a co-worker credibly established the presence of asbestos in the workplace through personal knowledge where the co-worker testified that he knew that the product contained asbestos because the product was labeled as containing asbestos.

Mr. Morgan's statements in his affidavit that the boilers, turbines, and pumps contained asbestos are not based on his actual knowledge, as is required by Pa.R.E. 701 and relevant case law. Instead, Mr. Morgan's affidavit reflects only his presumption and belief that these multiple products contained asbestos. Such statements are insufficient to show that there exists a genuine issue of fact as to the existence of asbestos in these products. *Gibson*, 861 A.2d at 948; *Samarin*, 571 A.2d at 404; *Bushless*, 585 A.2d at 503.

Additionally, such statements do not present competent evidence for the jury because it is speculative. A plaintiff cannot survive summary judgment when mere speculation would be required for the jury to find in plaintiff's favor. *Juliano v. Johns-Manville Corp.*, 611 A.2d 238, 239 (Pa. Super. 1992) (stating that "[i]n the absence of sufficient evidence demonstrating that plaintiff worked with or near the asbestos materials of a particular defendant, a jury cannot find, except by speculation, that it was a defendant's product which caused plaintiff's injury. Speculation, however, is an inadequate basis for recovery."). A jury is not permitted to find that it

was a defendant's product that caused the plaintiff's injury based solely upon speculation and conjecture; "there must be evidence upon which logically its conclusion must be based." *Farnese v. Southeastern Pennsylvania Transp. Authority*, 487 A.2d 887, 890 (Pa. Super. 1985). "In fact, the trial court has a duty to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation." *Id.* at 890. Additionally, a party is not entitled to an inference of fact that amounts merely to a guess or conjecture. *Flaherty v. Pennsylvania Railroad Co.*, 231 A.2d 179, 180 (Pa. 1967).

Thus, because Mr. Morgan's affidavit is based solely on speculation and conjecture, it is insufficient as a basis upon which Appellant's case can survive summary judgment. It fails to establish a genuine issue of material fact as to the presence of a specific manufacturer's product at a specific worksite where Decedent worked, and fails to establish that asbestos was present in those products in the various worksites. Appellant is not entitled to an inference of fact based merely on Mr. Morgan's unsubstantiated claims. *Flaherty*, 231 A.2d at 180.

Furthermore, Mr. Morgan's affidavit does not meet the "frequency, regularity, proximity" test required by *Eckenrod* and *Gregg*. In the affidavit itself, Mr. Morgan does not identify the length of time that he and Decedent were exposed to the alleged asbestos-containing products at each

worksite.  Instead, the affidavit states generally that "each of these jobs lasted approximately one week or longer."  Moreover, Mr. Morgan does not identify the proximity to the alleged asbestos-containing products with which Decedent worked.  Mr. Morgan's affidavit is insufficient to establish a causal connection between any of the individual Appellee Manufacturer's products and Decedent's disease.  Thus, we conclude that Mr. Morgan's affidavit, in and of itself, does not create a genuine issue of material fact precluding entry of summary judgment.  Accordingly, we review the claims and additional evidence Appellant presents regarding each named Appellee Manufacturer.

We first consider Appellant's claims as to Westinghouse. Westinghouse submitted a motion for summary judgment on the basis that Appellant failed to present any evidence that Decedent was exposed to asbestos from any products or equipment made, sold, supplied or specified by Westinghouse.  CBS Corporation (Westinghouse) Motion for Summary Judgment, 11/13/12, at 3.  Alternatively, it argued, that any claimed exposure to a Westinghouse product was insufficient to have caused Decedent's alleged injuries.  *Id.*

In her response to Westinghouse's motion for summary judgment, Appellant argued that summary judgment was inappropriate as there were disputed issues of material fact.  Plaintiff's Response to CBS Corporation's

(Westinghouse) Motion for Summary Judgment, 11/30/12, at 3. Appellant maintained that, pursuant to **Eckenrod** and **Gregg**, she had established Decedent's proximal, regular, and frequent exposure to asbestos-containing turbines manufactured by Westinghouse, compelling denial of the motion for summary judgment. **Id.** In support of her claim, Appellant attached the following documentation to her response: 1) "Exhibit A", the affidavit of Mike Morgan; 2) "Exhibit B", excerpts from the deposition of Mike Morgan; and 3) "Exhibit C", excerpted answers to interrogatories from an unrelated case filed against Westinghouse.

We have set forth and addressed the affidavit of Mike Morgan, identified as "Exhibit A," previously and concluded that such affidavit fails to establish that Decedent was exposed to Westinghouse turbines containing asbestos. Thus, we shall consider Appellant's additional evidence.

Attached as "Exhibit B," is an excerpt of the transcript from the deposition of Mike Morgan. Plaintiff's Response to CBS Corporation's (Westinghouse) Motion for Summary Judgment, 11/30/12, "Exhibit B." In that deposition, Mr. Morgan was asked if he had worked with Decedent at any sites where there was a Westinghouse turbine. **Id.** at 64. Mr. Morgan indicated that they both worked at AgraCo in 1978 and 1979, at which site there were Westinghouse turbines. **Id.** Mr. Morgan testified that there were three turbines, all three of which were manufactured by Westinghouse. **Id.**

at 71. The following exchange took place when Mr. Morgan was asked whether he had knowledge that the Westinghouse turbines at the AgraCo plant contained asbestos:

[Counsel]: Do you have any knowledge that the Westinghouse turbines at the AgraCo plant contained asbestos?

[Mr. Morgan]: Contains suspicious?

[Counsel]: Contained asbestos.

[Mr. Morgan]: I'm sorry.

[Counsel]: That's okay.

[Mr. Morgan]: No, I'm not aware of that.

[Counsel]: You have no knowledge of that?

[Mr. Morgan]: No.

*Id.* at 71.

Mr. Morgan stated that he and Decedent worked at the AgraCo site for approximately three weeks in 1978 and for approximately two weeks in 1979. Plaintiff's Response to CBS Corporation's (Westinghouse) Motion for Summary Judgment, 11/30/12, "Exhibit B" at 65. Additionally, Mr. Morgan testified that the closest he and Decedent got to the turbines was about twenty-five to thirty feet when entering or exiting the pump tank. *Id.* at 86-87. Mr. Morgan explained that "we never actually got right up next to one of them." *Id.* at 87. Mr. Morgan further testified to the atmosphere, twenty-

five to thirty feet from the turbines, as being "whatever the weather was like outside. You know, it was normal." ***Id.***

"Exhibit C" includes answers to interrogatories, completed by Westinghouse, in an unrelated case.[7] The relevant interrogatories and answers state as follows:

> B.4.a.    Are or have any of defendant's predecessors, affiliates, subsidiaries, or parent corporations engaged in the mining, sale and distribution of asbestos and/or asbestos fiber and/or asbestos containing insulation products? If so, state the name of each entity, describe the nature of the involvement that each entity has or has had in the mining, distribution or sale of these products and materials, and set forth the inclusive dates each was involved in each aspect of this business.

ANSWER:

> No, as to asbestos and asbestos fiber. As to "asbestos containing insulation products," the plaintiff has not defined that term. Westinghouse understands that term to mean a product whose sole or predominant purpose is to provide protection and/or insulation from extremely high temperatures. Subject to that understanding, only blankets associated with steam turbines qualify as such a material. Westinghouse sold these blankets between approximately 1930 and approximately 1960 as to some turbines it sold. Thereafter, such blankets were made, sold or furnished by others.

"Exhibit C," at 6.

> B.14     Has your company, and/or its subsidiaries or affiliates ever manufactured or distributed asbestos containing products?

---

[7] As noted, these answers to interrogatories were provided in an unrelated case. We make no determination as to the admissibility of these responses at trial.

ANSWER:

Without waiving its objections, and subject thereto, because of the unlimited scope of this interrogatory, the number of years Westinghouse has been in business, the size of its operations, and the fact that it does not keep records according to asbestos content, this interrogatory is extremely difficult to answer with certainty. Historically, Westinghouse has manufactured and sold equipment and components for the generation, transmission, use and control of electricity. Since its founding in the 1800's, Westinghouse has sold many thousands of different products, with hundreds of thousands of variations of those products. Upon information and belief, the following is a list of the products sold to the public by Westinghouse at any time, and which may have contained some amount of asbestos at some point in time, without specifying the type or amount of the asbestos ingredient or the potential or lack of potential for the release of respirable asbestos fibers. Further, only certain variations of these products contained asbestos; many other variations contained no asbestos.

* * *

steam & gas turbines and ancillary insulation

* * *

"Exhibit C," at 10-11.

Given the evidence presented by Appellant in an attempt to establish a *prima facie* case, we conclude that, viewing the evidence in the light most favorable to Appellant, Appellant has failed to produce sufficient evidence establishing a genuine issue of material fact that Westinghouse turbines at the AgraCo worksite contained asbestos during the time that Decedent worked there. Mr. Morgan's deposition testimony reveals that he had no knowledge of the Westinghouse turbines containing asbestos. The answers

to interrogatories also fail to establish that the turbines at the AgraCo site contained asbestos. As the answers to interrogatorries provide, Westinghouse manufactured numerous products that may or may not have contained asbestos. The evidence simply does not present a jury with a genuine issue of material fact that the Westinghouse turbines at the AgraCo site contained asbestos. Thus, Appellant has failed to establish that asbestos was present in the Westinghouse turbines at the AgraCo worksite.

Furthermore, Decedent's evidence fails to meet the "frequency, regularity, proximity" requirements of *Eckenrod* and *Gregg.* Appellant has failed to establish that Decedent had regular and frequent exposure in close proximity to the turbines. Mr. Morgan's testimony established that he and Decedent were approximately twenty-five to thirty feet away from the turbines, "never actually got right up next to one of them," and the atmosphere around the turbines was "normal," congruent with the weather outside. Thus, Appellant has failed to establish a genuine issue of material fact that Decedent inhaled asbestos fibers from a Westinghouse turbine due to regular and frequent exposure in close proximity to the turbine. Summary judgment was properly entered in favor of CBS Corporation (Westinghouse).[8]

---

[8] Appellant maintains throughout her brief that the discrepancies between Mr. Morgan's affidavit testimony and deposition testimony create a material issue of fact. Appellant's argument, however, is misdirected. The cases

In Appellant's next claim, she argues that the trial court erred as a matter of law when it granted summary judgment in favor of GE. Appellant's Brief at 42. Appellant argues that summary judgment was improper because the record reveals a genuine issue of material fact concerning Decedent's frequent, regular, and proximate exposure to asbestos in GE's turbines. *Id.* at 42-45.

GE moved for summary judgment on the basis that Appellant failed to establish that Decedent was exposed to asbestos-containing products or equipment made, sold, supplied or specified by GE. General Electric Company's (GE) Motion for Summary Judgment, 11/13/12, at 3. In the alternative, GE argued, any claimed exposure to a GE product was insufficient to have caused Decedent's alleged injuries. *Id.*

In response to GE's motion for summary judgment, Appellant relied upon the following evidence, maintaining that it created an issue of material fact, precluding entry of summary judgment: 1) the affidavit of Mike

---

cited by Appellant in support of this claim involved discrepancies in testimony among different witnesses. The single case Appellant cites involving discrepancy in testimony of a single witness held that the more favorable testimony should be accepted under the standard for motion for summary judgment, not that summary judgment was defeated because a material issue of fact was created. *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 476 n. 14 (3d Cir. 1998). Additionally, this Court has granted summary judgment in cases where discrepancies exist between a single witness's affidavit and deposition testimony. *See Bushless*, 585 A.2d at 504. Thus, such discrepancy, in and of itself, does not defeat summary judgment.

Morgan, "Exhibit A"; 2) excerpts from the Mike Morgan deposition, "Exhibit B"; 3) an affidavit executed by David Krauss, "Exhibit C"; 4) excerpts from the David Krauss deposition, "Exhibit D"; 5) GE interrogatory answers from an unrelated case, "Exhibit E"; and 6) a March 11, 1960 document entitled "Application of Type A Plastic Insulation to Typical Turbine Valve", which has GE's name at the top, "Exhibit F." Plaintiff's Response to General Electric Company's Motion For Summary Judgment, 12/7/12.

As stated previously, Mike Morgan's Affidavit, "Exhibit A," due to its speculative and vague nature, fails to establish that Decedent was exposed to asbestos from GE turbines. In the excerpted deposition testimony of Mike Morgan, when asked whether he worked at any site with Decedent where there was a GE turbine, Mr. Morgan responded, "AgraCo." Plaintiff's Response to General Electric Company's Motion for Summary Judgment, 12/7/12, "Exhibit B" at 63. He testified that he and Decedent worked at AgraCo in 1978 and 1979. *Id.* at 64. The excerpt, however, reveals no testimony that the GE turbine had asbestos. Nor was there testimony as to the proximity of the turbine within which Mr. Morgan and Decedent worked or to the length of time Mr. Morgan and Decedent worked at that site.

"Exhibit C" is the affidavit of David Krauss, dated August 28, 2012. This affidavit provides as follows:

> I, <u>David Krauss</u>, being first duly sworn, depose and state as follows:

1. I worked with my father, Henry Michael (Hank) Krauss, in the bricklaying trade.

2. I worked with my father at numerous job sites while in the employ of John Wayne Smith Masonry in Baton Rouge, Louisiana from 1976 to 1978 and while in the employ of Kirkland Masonry in Boca Raton, Florida in 1981.

3. At our job sites we worked with products manufactured by Georgia[-]Pacific including joint compound and other adhesive products.

4. We worked with General Electric turbines while we were employed by John Wayne Smith Masonry.

5. The above-mentioned products contained asbestos to the best of my knowledge and belief.

6. The use of said products created a great deal of visible dust. That dust got on our clothing, in our hair and in our lungs. We breathed in that dust and were never given any warning that inhalation of asbestos fibers could be hazardous to our health.

"Exhibit C," Affidavit of David Krauss, 8/28/12, at 1.

This affidavit of David Krauss is very similar to the one prepared by Mike Morgan and discussed previously. David Krauss states that he and Decedent worked with products manufactured by Georgia-Pacific and GE at "numerous job sites," but does not provide any evidence or information as to what specific products were at which designated job sites. The affidavit also fails to present specific evidence that the GE turbines and the products manufactured by Georgia-Pacific contained asbestos. Instead, he summarily concludes that they did, based on his "knowledge and belief." For the

reasons stated previously in the context of our discussion of Mike Morgan's affidavit, vague and speculative testimony is insufficient to establish Appellant's claim that Decedent was exposed to asbestos-containing products or equipment manufactured by Georgia-Pacific or GE. ***See Gibson***, 861 A.2d at 946 (concluding that witness's testimony that he "believed" a substance was asbestos was insufficient to establish that asbestos existed in the workplace.); ***See also Farnese***, 487 A.2d at 890 (A jury is not permitted to find that it was a defendant's product which caused the plaintiff's injury based solely upon speculation and conjecture; "there must be evidence upon which logically its conclusion must be based"). Thus, we conclude that David Krauss's affidavit is insufficient to establish a genuine issue of material fact that Decedent was exposed to these products or equipment or that these products and equipment contained asbestos.

Furthermore, the affidavit is insufficient to meet the "frequency, regularity, proximity" test as set forth in ***Eckenrod*** and ***Gregg***. Mr. Krauss's affidavit fails to address the frequency, regularity, or proximity of his and Decedent's exposure to any alleged asbestos. As a result, Krauss's affidavit fails to establish an issue of material fact and does not preclude entry of summary judgment.

"Exhibit D" consists of an excerpt of David Krauss's deposition testimony. David Krauss testified that he and Decedent worked in Boca

Raton for Kirkland Masonry in 1981. "Exhibit D" at 30. He testified that at that site, he and Decedent were building a wall near a turbine. *Id.* He testified that as they worked, they were approximately three or four feet away from the turbine. *Id.* at 31-32. David Krauss testified that the turbines were from General Electric. *Id.* at 32. He stated that he and Decedent worked in this location for two, eight-hour days. *Id.* at 32. He described the working atmosphere around the turbine as being "loud, dusty, noisy." *Id.* When asked if there was any insulation on the turbine, David Krauss stated: "I couldn't really tell you yes or no." *Id.* at 33.

In its motion for summary judgment, GE provided additional pages from that deposition. Interestingly, and as omitted by Appellant, during that same deposition, David Krauss provided the following testimony regarding the GE turbines:

> [Counsel]: Now, I understand that you made it quite clear that his overall job down in the basement was a very dusty job?
>
> [Mr. Krauss]: Yeah.
>
> [Counsel]: But is it safe to say you can't tell whether any of the dust came from this piece of equipment that you call a turbine or not?
>
> [Mr. Krauss]: I couldn't tell you. Possibly -- I don't know.
>
> [Counsel]: You just don't know?
>
> [Mr. Krauss]: **I just don't know.**
>
> [Counsel]: You were there the whole time --

[Mr. Krauss]:    The whole time and I just don't know.

[Counsel]: And what anything [sic] that came from the turbine was made of, again, you personally don't know?

[Mr. Krauss]:    Right.

[Counsel]: And you have no knowledge whether it was -- what it was, whether anything there had asbestos or didn't have asbestos, did you, on that piece of equipment?

[Mr. Krauss]:    **I did not know, no.**

[Counsel]: So, in terms of whether any asbestos was shed by this turbine or this piece of equipment that you associate with my client, without guessing or speculating, you don't know?

[Mr. Krauss]:    **I don't know.**

[Counsel]: So, you can't say without guessing or speculation that you were ever exposed to any dust from any piece of General Electric equipment; can you?

[Mr. Krauss]:    No.  All I know it was dusty down there.

[Counsel]:  In that basement?

[Mr. Krauss]:    Yeah.

[Counsel]: But you can't attribute it to that particular piece of equipment?

[Mr. Kraus]:    Right.  I just know it was dusty down there and I couldn't wait to get the wall up to get out of there.

[Counsel]: Gotcha.  And I take it you never saw the word "asbestos" associated with that piece of equipment from GE?

[Mr. Krauss]:    No.

[Counsel]: You never saw any writing that told you what was in there one way or another?

[Mr. Krauss]:    No.

[Counsel]: And you never had any training from your father or from the union or from any other source that there was any asbestos whatsoever associated with that equipment; did you?

[Mr. Krauss]:    No.

General Electric Company's ("GE") Motion for Summary Judgment, 11/13/12, "Exhibit 2," at 174-176 (emphasis added).

Thus, David Krauss's deposition testimony reveals that he had no knowledge that the GE turbine contained asbestos, in contradiction to his "belief," as stated in his affidavit. He stated that he could not recall if there was any insulation on the turbine. Additionally, during his deposition, David Krauss was unable to affirmatively identify GE turbines as the source of the dust. Thus, Appellant has not presented an issue of material fact as to the existence of asbestos on a GE turbine at the Boca Raton site.

In her appellate brief, Appellant acknowledges that this deposition testimony undercuts David Krauss's affidavit. Appellant's Brief at 44. Appellant maintains, however, that the contradictions in David Krauss's affidavit and deposition testimony create an issue of material fact, precluding entry of judgment. *Id.* at 44-45. Additionally Appellant asserts that these discrepancies are remedied by GE's answers to interrogatories and specifications. *Id.* We cannot agree.

First, as addressed previously in the context of discrepancies between the affidavit and deposition testimony of Mike Morgan, there is no case law supporting Appellant's claim that contradiction in a single witness's testimony creates an issue of material fact precluding entry of summary judgment. The cases cited by Appellant are not controlling in this matter because those cases concern a contradiction in testimony between several witnesses that creates a genuine issue of material fact. In fact, this Court has encountered scenarios where contradictions in a single witness's testimony occur, yet they do not create genuine issues of material fact defeating summary judgment. In **Stephens v. Paris Cleaners, Inc.**, 885 A.2d 59, 65-66 (Pa. Super. 2005), contradictions existed between claimant's affidavit and deposition testimony regarding product identification. This Court affirmed the trial court's entry of summary judgment; these contradictions did not create a genuine issue of material fact defeating summary judgment. **Id.** at 65, 72. Furthermore, we note that this Court has chosen not to believe apparently fabricated affidavits where the deposition testimony shows to the contrary. **Id.** at 65.

We next address Appellant's claim that the discrepancies in David Krauss's affidavit are remedied, or bolstered, by GE's answers to interrogatories and specifications. Appellant attached "Exhibit E," which consists of GE's answers to interrogatories from an unrelated case that was

litigated in 1994, to her response.[9]  In answers to queries as to whether GE

ever manufactured or distributed asbestos-containing products, GE provided

the following response:

> GE objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, harassing, vague, ambiguous and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving any specific or general objections, GE states that it is not now, nor has it ever been, a miner, miller, supplier, importer, processor, distributor, marketer or seller of raw asbestos fiber.  GE further states that for a period of time prior to 1980, WCBD was engaged in the manufacture of electrical wire and cable, a small percentage of which contained encapsulated chrysotile.  GE states that it ceased manufacturing encapsulated chrysotile-containing wire and cable by 1980.

"Exhibit E," at 13-14.  GE also provided the following information in response

to an unidentified interrogatory:

> GE objects to this Interrogatory as it is directed to the asbestos mining/manufacturing community of which GE was not a part. GE further objects to this Interrogatory as plaintiffs have failed to identify with any degree of particularity any TBO asbestos-containing products to which exposure is alleged.  Without waiving said objections, TBO sold steam-turbine generators to power generating companies in New Jersey, but defendant does not consider steam-turbine generators to be within the definition of "asbestos-containing product."  However, steam-turbine generators call for, as both original and replacement parts, certain vendor-supplied items comprised in part of asbestos-containing products.

"Exhibit E," at 5 (numbered internally within the exhibit as no page number

is provided on the document).

---

[9] Again we note that we are not addressing the admissibility of such evidence at trial.

We cannot agree that these answers to interrogatories create an issue of material fact as to the existence of asbestos in the GE turbines allegedly at Decedent's worksites. In the first answer, GE acknowledges that what appears to be an undefined subsidiary "engaged in the manufacture of electrical wire and cable, a small percentage of which contained encapsulated chrysotile." In this case, there has been no claim that Decedent was exposed to electrical wire or cable containing asbestos manufactured by GE. Moreover, it does not appear that GE manufactured this cable and wire, but instead, it was manufactured by "WCBD."[10] The answer also states that a small percentage of these products contained encapsulated chrysotile. Thus, even if David Krauss and Decedent were exposed to such products, there is no guarantee, indeed, no evidence, that those products would have been, in fact, the small percentage of products that contained encapsulated chrysotile.

Furthermore, with regard to the second outlined answer to interrogatory, GE acknowledged that "TBO," and not GE, sold "steam-turbine generators."[11] Additionally, as stated, these steam-turbine generators were not considered "asbestos-containing products."

---

[10] Appellant attached only a few pages from the answers to interrogatories and this term is not defined in the pages provided.

[11] The page attached does not define the term "TBO."

Additionally, the answer indicates that these turbines were sold to power-generating companies in New Jersey. There is no evidence linking these turbines to the Decedent's worksites. *See* Plaintiff's Response to General Electric Company's Motion for Summary Judgment, 12/7/12, "Exhibit C," Affidavit of David Krauss (stating that David Krauss and Decedent were exposed to GE turbines while employed by John Wayne Smith Masonry in Baton Rouge, Louisiana). Thus, these responses to interrogatories fail to establish a genuine issue of material fact that asbestos-containing GE turbines were at the worksite where he and Decedent worked.

Finally, Appellant attached "Exhibit F" to her response. "Exhibit F" consists of two pages of diagrams, the first is entitled, "Application of type A plastic insulation to typical turbine valve," and the second is entitled, "Application of all plastic or sprayed on turbine shell and horizontal flange," and both are dated April 1960. Plaintiff's Response to General Electric Company's Motion for Summary Judgment, 12/7/12, "Exhibit F". In her response to GE's motion for summary judgment, Appellant maintains that this exhibit provides evidence that GE specifications for its turbines called for the use of asbestos containing insulation. *Id.* at 5. Appellant also contends that this exhibit establishes that GE turbines were manufactured and sold with asbestos. *Id.* at 7. We disagree.

A review of the first diagram reveals several labels, including one reading "Type F asbestos cloth * ." Plaintiff's Response to General Electric Company's Motion For Summary Judgment, 12/7/12, "Exhibit F", at 1. Several of the labels include the asterisk (*) symbol. *Id.* A key on the left side of the diagram indicates that the asterisk denotes "material supplied by insulation contractor." *Id.* Thus, it does not appear that the asbestos cloth, or other materials, were manufactured or supplied by GE.

On the second diagram there are references to the use of asbestos paper. Plaintiff's Response to General Electric Company's Motion for Summary Judgment, 12/7/12, "Exhibit F", at 2. These references to asbestos paper also were marked with an asterisk, indicating "material supplied by insulation contractor." *Id.* Thus, the asbestos paper was not manufactured or supplied by GE.

Moreover, we note that Appellant has failed to establish that these are diagrams for the GE turbines that were allegedly at Decedent's worksite. Appellant fails to ever identify the source of these diagrams. The diagrams themselves are dated April 1960, and Appellant has failed to establish their relevance to the GE turbines allegedly at Decedent's worksites. Accordingly, we cannot agree that these answers to interrogatories support Appellant's claim that the turbines at Decedent's worksite were asbestos-containing equipment manufactured by GE.

Thus, Appellant has failed to establish that GE products containing asbestos were present at the worksites. Because Appellant has failed to create an issue of material fact establishing that Decedent was exposed to asbestos-containing GE products, the "frequency, regularity, proximity" analysis is not triggered. Accordingly, the trial court properly entered summary judgment in favor of GE.

Next, we address Appellant's claim regarding Georgia-Pacific. Georgia-Pacific filed a motion for summary judgment on the basis that Appellant failed to establish that Georgia-Pacific had manufactured a product from which Decedent was exposed to asbestos. Georgia-Pacific LLC's Motion for Summary Judgment, 11/13/12, at 3. Georgia-Pacific also contends that because there was no evidence provided upon which a jury could reasonably conclude that any Georgia-Pacific product used by Decedent contained asbestos, there is no need to perform the "frequency, regularity, proximity" analysis. Appellee Georgia-Pacific's Brief at 13.

Appellant argues that the record reveals a genuine issue of material fact concerning Appellant's exposure to Georgia-Pacific's asbestos-containing products. Appellant's Brief at 46. Appellant maintains that the David Krauss affidavit and excerpts from his deposition, the Mike Morgan Affidavit and deposition testimony, and Georgia-Pacific's interrogatory answers establish this exposure. *Id.* Appellant asserts that:

the Krauss affidavit establishes that Georgia-Pacific joint compound and other adhesive products contained asbestos when he worked with his father from 1976 to 1978 and in 1981: '[t]he above-mentioned products contained asbestos to the best of my knowledge and belief.'

*Id.* at 47. Appellant further argues that the answers to interrogatories reveal Georgia-Pacific's admission that it manufactured products with asbestos until 1977. *Id.*

In support of Appellant's response to Georgia-Pacific's motion for summary judgment, she attached the following documents, as referenced previously: "Exhibit A," affidavit of Mike Morgan; "Exhibit B," excerpt of deposition testimony of Mike Morgan; "Exhibit C," affidavit of David Krauss; "Exhibit D," excerpts from deposition testimony of David Krauss; and "Exhibit E," interrogatory responses from Appellee Georgia-Pacific.

As explained previously, due to its speculative and vague nature, "Exhibit A," Affidavit of Mike Morgan, does not establish that Decedent was exposed to asbestos-containing products manufactured by Appellee Georgia-Pacific. Moreover, Mr. Morgan's allegation that Decedent was exposed to asbestos-containing products and equipment stated: "All of the **boilers**, **turbines** and **pumps** were insulated with heat-resistant asbestos products to the best of my knowledge and belief." "Exhibit A," ¶8 (emphasis added). There is no allegation that the Georgia-Pacific compound contained asbestos. As such, the affidavit fails to establish that Decedent was exposed to

asbestos-containing products manufactured by Appellee Georgia-Pacific. Additionally, such affidavit fails to establish the "frequency, regularity, proximity" requirements.

The excerpt of the Mike Morgan deposition testimony reflects the following exchange:

> [Counsel]: Now, you did speak a little bit about Georgia[ - ] Pacific, and I'm reading where it says: There were a number of products manufactured by Georgia[-]Pacific, including joint compound and other adhesive products.
>
> This is in that document that you sent. Is that an accurate statement or is not an accurate statement?
>
> * * *
>
> [Mr. Morgan]: Yes, it is accurate. I have seen these products. I don't necessarily know what they are used for or what they do, but I have seen them.
>
> [Counsel]: And where did you see them, if you recall, sir?
>
> [Mr. Morgan]: Possibly on job sites.
>
> [Counsel]: Do you remember anything about the logo of a Georgia[-]Pacific product? Do you know what I mean by logo?
>
> * * *
>
> [Mr. Morgan]: No.
>
> [Counsel]: If you had seen it, do you remember seeing it in either a package or a can?
>
> * * *
>
> [Mr. Morgan]: Name the product again, please.

[Counsel]:  It would be Georgia[-]Pacific joint compound.

[Mr. Morgan]:    No.  I probably have seen that at Lowes or Home Depot.  I believe it's sheetrock finishing material.  They call it sheetrock mud.

[Counsel]:  Are you saying, sir, that you and [Decedent] did not either use or were around people at the job sites that used that product; is that what you're saying?

* * *

[Mr. Morgan]:    That's correct.  Yeah, we didn't work around it.  You know, people that were hanging sheetrock or finishing it, you know, no.  We always worked outside of a building.  Sheetrock people work on the inside.

[Counsel]: So, are you saying you weren't around it in the inside?

* * *

[Mr. Morgan]:    Yes, I'm saying that.

Plaintiff's Response to Georgia-Pacific's Motion For Summary Judgment, "Exhibit B," at 90-93.

As outlined above, Mike Morgan's testimony failed to establish that he and Decedent were exposed to joint compound manufactured by Appellee Georgia-Pacific.  In fact, Mike Morgan could not identify a job site at which he had seen these products, indicating instead that he "probably" saw it at Lowes or Home Depot.  Furthermore, Mr. Morgan testified that if this joint compound was used at any of the worksites where Decedent worked, such product would be used inside, by the "sheetrock people."  He and Decedent,

he explained, always worked on the outside of a building. Thus, Mr. Morgan's testimony fails to establish that Decedent was exposed to Georgia-Pacific's compound and makes no mention of that product containing asbestos.

Attached as "Exhibit C" is the affidavit of David Krauss. As outlined previously, the speculative and vague nature of this affidavit is insufficient to establish that Decedent was exposed to Georgia-Pacific's joint compound or that the product contained asbestos.

Appellant also attached portions of David Krauss's deposition testimony as "Exhibit D." This excerpt reveals that David Krauss went to work with his father, Decedent, in the summer of 1981 for Kirkland Masonry in Fort Lauderdale, Florida. Plaintiff's Response to Georgia-Pacific's Motion for Summary Judgment, 11/30/12, "Exhibit D," at 18-20. At that time, Mr. Krauss testified to using Georgia-Pacific spackling. *Id.* at 19. Mr. Krauss also testified that the compound was contained in five-gallon buckets. *Id.* at 23. He did not provide testimony regarding his knowledge of whether the compound contained asbestos.

Georgia-Pacific's motion for summary judgment includes additional portions of David Krauss's testimony not revealed by Appellant. Georgia-Pacific LLC's Motion for Summary Judgment, 11/13/12, "Exhibit A." A review of that excerpt reflects the following. David Krauss testified that the

manufacturer of the spackling compound used at the worksite where he worked in 1976 was Georgia-Pacific. *Id.* at 129. According to Mr. Krauss's affidavit, he worked at job sites in Baton Rouge, Louisiana, from 1976 to 1978. Plaintiff's Response to Georgia-Pacific's Motion for Summary Judgment, 11/30/12, "Exhibit C," at ¶ 2. Mr. Krauss testified that he saw two five-gallon buckets at the worksite. Georgia-Pacific's LLC's Motion for Summary Judgment, 11/13/12, "Exhibit A," at 130. He described the buckets as being white, having blue writing, and the "GP" logo on them. *Id.* When David Krauss was asked whether he had any knowledge that the compound contained asbestos, he responded that he did not have any such knowledge. *Id.* at 132-133. He also testified that he did not see anything on the product itself to indicate that it contained asbestos. *Id.* at 133, 140.

Mr. Krauss also testified that he worked at sites in Fort Lauderdale in 1981. Georgia-Pacific's LLC's Motion for Summary Judgment, 11/13/12, "Exhibit A," at 150-151. Mr. Krauss testified that Georgia-Pacific's spackling compound was used at these sites. *Id.* at 153. He stated that he had no knowledge that this product contained asbestos. *Id.* at 155. He again testified that he saw nothing on the product itself to indicate that it contained asbestos. *Id.*

While viewing the evidence in a light most favorable to Appellant, we conclude that David Krauss's deposition testimony established that Georgia-

Pacific's compound was located at the jobsites. There is no evidence, however, that any of the identified compounds contained asbestos.

Attached as "Exhibit E" is an unidentified, apparent excerpt from an answer to interrogatories. Plaintiff's Response to Georgia-Pacific's Motion for Summary Judgment, 11/30/12, "Exhibit E." Appellant identifies this document as Georgia-Pacific's response to interrogatories. Appellant maintains that in these answers to interrogatories, Georgia-Pacific admitted to selling and manufacturing joint compound that contained asbestos, and directs our attention to four sub-parts of the answers. Plaintiff's Response to Georgia-Pacific's Motion for Summary Judgment, 11/30/12, at 6.

The referred to answers to interrogatories are set forth as follows:

### ALL PURPOSE JOINT COMPOUND

Georgia-Pacific first placed All Purpose Joint Compound on the market for national distribution in 1967. Prior to that time, All Purpose Joint Compound may have been available for sale in limited areas. Georgia-Pacific first introduced asbestos-free All Purpose Joint Compound in 1973. The availability of asbestos-free and asbestos-containing formulations may have varied from state to state during the years 1973-1977. The last year that Georgia-Pacific manufactured asbestos-containing All Purpose Joint Compound was 1977. Georgia-Pacific continues to sell asbestos-free All Purpose Joint Compound. The product is a white or off-white powder used in wallboard construction to finish walls and ceilings. This product could not withstand high temperatures, moisture or excessive vibration. For these reasons, use of this product in industrial conditions or in the maritime industry was neither recommended nor forseeable, and, indeed, would have constituted a misuse of the product. All Purpose Joint Compound was packaged in bags. All Purpose Compound contained 0-7% chrysotile fibers.

Plaintiff's Response to Georgia-Pacific's Motion for Summary Judgment, 11/30/12, "Exhibit E," at 12-13, subpart 1.

### JOINT COMPOUND

Bestwall first sold "Joint Compound," also sold as Joint System, Joint System Cement, and Joint System Compound, in 1956, and Georgia-Pacific continued to manufacture the product after it acquired Bestwall in 1965. Information suggests that after January 1975, though perhaps as early as 1973, this product was no longer manufactured with asbestos as a constituent ingredient. The availability of asbestos-free and asbestos-containing formulations may have varied from state to state during these years. The product as a dry white or off-white powder used in wallboard construction to finish walls and ceilings. This product could not withstand high temperatures, moisture or excessive vibration. For these reasons, use of this product in industrial conditions was neither recommended nor foreseeable and, indeed, would have constituted a misuse of the product. This product was packaged in bags and boxes. Joint Compound contained 0-6% chrysotile fibers.

*Id.*, "Exhibit E," at 14-15, subpart 5.

### SPACKLING COMPOUND

Bestwall began selling Spackling Compound in 1956, and Georgia-Pacific continued to manufacture Spackling Compound after it acquired Bestwall in 1965, until 1970 or 1971. The product was a dry white or off-white powder used to patch or repair walls and ceilings. This product could not withstand high temperatures, moisture or excessive vibration. For these reasons, use of this product in industrial conditions or in the maritime industry was neither recommended nor forseeable and, indeed, would have constituted a misuse of the product. Spackling Compound was packaged in bags or boxes. Spackling Compound contained 5.5% chrysotile fibers.

*Id.*, "Exhibit E," p. 17, subpart 11.

### TRIPLE DUTY JOINT COMPOUND

Georgia-Pacific has sold Triple Duty Joint Compound under the following brand/trade names:  Triple Duty Joint Compound, Triple Duty Wallboard Joint Compound, and Triple Duty Joint Compound-Vinyl Based Adhesive.  Georgia-Pacific first sold Triple Duty Joint Compound in 1965.  Georgia-Pacific introduced asbestos-free Triple Duty Joint Compound in 1973.  The availability of asbestos-free and asbestos-containing formulations may have varied from state to state during the years 1973-1977.  The product is a dry white or off-white powder used in wallboard construction to finish walls and ceilings.  This product could not withstand high temperatures, moisture or excessive vibration.  For these reasons, use of this product in industrial conditions or in the maritime industry was neither recommended nor forseeable and, indeed, would have constituted a misuse of the product.  Triple Duty Joint Compound was packaged in bags.  Triple Duty Joint Compound contained 0-7% chrysotile fibers.

Id., "Exhibit E," at 19, subpart 15.

We first note that these answers to interrogatories do not establish that any of the products containing asbestos were at the jobsites where Decedent worked.  Additionally, the answers establish that Georgia-Pacific introduced into the market asbestos-free joint compound in 1973 and that the last Georgia-Pacific compounds containing asbestos were manufactured in 1977.  In fact, the spackling compound was not made after 1970 or 1971.  Thus, there is no evidence that the compounds at the worksite where Decedent worked in 1976 through 1978 and in 1981 contained asbestos.

Appellant maintains that merely because Georgia-Pacific stopped manufacturing asbestos-containing products in 1977 does not mean that it

stopped selling its inventory of those products in 1977, or that wholesalers stopped supplying contractors with those products. Appellant avers that accordingly, these products could have been sold in 1978 or even later. While we agree that this theory is possible, such speculation is insufficient to establish that Decedent was exposed to asbestos-containing products manufactured by Georgia-Pacific. *Juliano*, 611 A.2d at 239 ("A plaintiff cannot survive summary judgment when mere speculation would be required for the jury to find in plaintiff's favor").

Furthermore, Mr. Krauss testified that he and Decedent worked on industrial projects, and these compounds, according to the answers to interrogatories provided by Appellant, were not intended for use in industrial conditions. Additionally, the answers establish that these compounds were packaged in bags and boxes. David Krauss testified that the Georgia-Pacific compounds he saw at the worksites were in five-gallon buckets. Thus, we cannot agree that the answers to interrogatories create a genuine issue of material fact as to the existence of asbestos-containing products manufactured by Georgia-Pacific at Decedent's worksites.

Because Appellant has failed to provide any evidence upon which a jury reasonably could conclude that Decedent was exposed to asbestos-containing products manufactured by Georgia-Pacific, we need not conduct the "frequency, regularity, proximity" analysis. As Appellant has failed to

establish any causal connection between a Georgia-Pacific asbestos-containing product and Decedent's mesothelioma, the trial court properly granted Georgia-Pacific's motion for summary judgment.

Appellant's next claim is that the trial court erred as a matter of law in granting the motion for summary judgment of Goulds Pumps where the record reveals a genuine issue of material fact concerning frequent, regular, and proximate exposure to asbestos in Goulds Pumps. Appellant's Brief at 9, 49. Appellee Goulds Pumps filed its motion for summary judgment on the basis that Appellant failed to offer evidence that Decedent was exposed to asbestos from any products manufactured, supplied, or distributed by Goulds Pumps. Motion for Summary Judgment on Behalf of Defendant, Goulds Pumps, Inc., re: Insufficient Product Identification, 11/13/12, at 3. Furthermore, Goulds Pumps contends that Appellant has failed to present evidence that Decedent was exposed on a frequent basis to asbestos-containing products supplied or manufactured by Goulds Pumps. *Id.*

Appellant argues that a material issue of fact existed as to Decedent's exposure to asbestos-containing pumps manufactured and sold by Goulds Pumps. In support of that claim, Appellant maintains that the record establishes that Decedent worked at facilities where there were large industrial pumps manufactured by Goulds Pumps. Appellant's Brief at 50. Appellant maintains that Decedent was around Goulds Pumps' pumps during

"turnarounds," when the pumps were taken apart and repairs were done on them. *Id.* Appellant also asserts that Decedent was near these pumps when they were operating. *Id.* at 50-51. The pumps were allegedly insulated with asbestos products and a great deal of visible dust was created, getting on Decedent's hair and in his lungs. *Id.* at 50. Appellant maintains that the jobs lasted approximately one week or longer. *Id.* In attempting to establish her claim, Appellant attached the following documentation to her response to Goulds Pumps' motion for summary judgment: "Exhibit A," affidavit of Mike Morgan; "Exhibit B," excerpt from the deposition testimony of Mike Morgan; "Exhibit C," excerpt from the deposition testimony of Peter Same; "Exhibit D," excerpt from deposition testimony of Robert McGowan; "Exhibit E," excerpt from the deposition testimony of E. Barry Bradshaw. Plaintiff's Response to Goulds Pumps Motion for Summary Judgment, 11/30/12.

For reasons discussed at length previously, we conclude that the affidavit of Mike Morgan is insufficient to establish that asbestos-containing pumps sold and manufactured by Goulds Pumps were at Decedent's worksites. Thus, the affidavit does not establish a genuine issue of material fact defeating summary judgment.

Appellant also relies on the deposition testimony of Mr. Morgan. A review of this testimony reflects the following exchange:

[Counsel]: In terms of any experience with pumps, did you or [Decedent] ever personally work on any pumps?

[Mr. Morgan]: No. We never physically worked on any pumps, no.

[Counsel]: You mentioned a name of a company, Goulds Pumps, in your statement. Is that just something that you're familiar with, but don't really have any knowledge about whether [Decedent] was exposed to asbestos from that pump?

[Mr. Morgan]: Correct. I'm familiar with Goulds pumps. You know, they are everywhere in these plants.

[Counsel]: But you don't have any firsthand knowledge as to whether [Decedent] was exposed to any asbestos from any Goulds pumps; do you?

[Mr. Morgan]: No.

Plaintiff's Response to Goulds Pumps Motion for Summary Judgment, 11/30/12, "Exhibit B," at 55-56.

This exchange fails to establish that there was asbestos in these pumps or that Decedent was exposed to asbestos from these pumps. Thus, there is no genuine issue of material fact that Decedent was exposed to asbestos from a Goulds Pumps product.

Mr. Morgan provided additional testimony regarding his and Decedent's exposure to Goulds Pumps' pumps at various jobsites. The remainder of the testimony pertained to the frequency, regularity, and proximity of exposure to these pumps.

[Counsel]: Were you and [Decedent] ever around a Goulds pump during a turnaround?

[Mr. Morgan]: I'm sure we were. You know, I don't remember the exact day or anything, but I'm sure we were.

[Counsel]: Do you recall, and I'm not asking you a specific day, were you ever around a Goulds pump during turnaround when the Goulds pumps were being worked on?

[Mr. Morgan]: Yes. . . . They take them apart and do the repairs on them and, you know, get them all leveled back up, you know, maybe disconnect pipes from them. You know, that's constantly going on. That's part of the turnaround.

[Counsel]: During that process, the turnaround, when they were working, others, not you or [Decedent], working on the Goulds pumps, would you ever have occasion to be near them?

[Mr. Morgan]: Yes, I'm sure we have. You know, sometimes you are going from one place to the other, maybe from our tool shed to the job site itself. I'm sure you are going to have walk passed [sic] them. You're going to have to get close to them sometimes.

[Counsel]: When you and [Decedent] would get close to the Goulds pumps, during this process at the turnaround, would the atmosphere around the pump be dusty?

[Defense Counsel]: Objections; form.

[Defense Counsel]: Objection; lack of foundation, vague.

[Mr. Morgan]: Not to my knowledge.

* * *

[Counsel]: You had mentioned Goulds pumps before. Were there other pumps also or were there primarily Goulds pumps that you saw at these sites?

[Mr. Morgan]: There's different pumps. I know I had seen General Electric pumps. I've seen one pump I think it was Poulean.

* * *

[Counsel]: Were any of these pumps functioning when you and [Decedent] walked by them?

[Mr. Morgan]:     Yes.  If you walk through a live unit, yes.

* * *

[Counsel]: Were you and [Decedent] ever around a Goulds pump when one of the workers was changing the gasket material?

* * *

[Mr. Morgan]:    I don't recall specifically, but, you know, I'm sure we walked passed [sic] them, you know, on our way back and forth to where we were working at.  I'm sure we walked passed [sic] them.

* * *

[Counsel]: Now, during that process, when the workers would, in fact, be working on the packing at the Goulds pumps, during that particular process did you note that the area near where the packing was, that they are removing and replacing, was more dusty than when it was not being worked on?

* * *

[Mr. Morgan]:     I never really noticed anything like that.

Plaintiff's Response to Goulds Pumps Motion for Summary Judgment, 11/30/12, "Exhibit B," at 94-101.[12]

---

[12] While several objections were made during the deposition testimony, this Court has held that when ruling on a motion for summary judgment, where no trial ruling was made on an objection during deposition testimony, there

We note that Mr. Morgan testified that he and Decedent never worked on pumps. Mr. Morgan testified that he was "familiar" with the name "Goulds Pumps" and then made the blanket statement that they are "everywhere" in these plants. He further testified that he had no knowledge that Decedent had been exposed to asbestos as a result of one of these Goulds Pumps' pumps. His testimony reveals that he saw many pumps, manufactured by different companies.

Additionally, Mr. Morgan's testimony reveals that he simply presumes that he and Decedent were around a Goulds Pumps pump despite not being able to remember specifics about those times. He testified that he and Decedent walked by the pumps when the pumps were operational and during turnarounds. Additionally, there is no testimony regarding the frequency, regularity, or proximity to these pumps during either the turnaround or while they were operational. He testified that it was not more dusty once the pumps were being worked on during a turnaround. Mr. Morgan's testimony is extremely vague and speculative as to his and Decedent's exposure to a Goulds Pumps pump.

Mr. Morgan's deposition testimony has not established that Decedent was exposed to asbestos from a Goulds Pumps pump, or that Decedent was exposed to a Goulds Pumps pump with the required frequency, regularity

is no reason not to consider the answer. ***Weible v. Allied Signal, Inc.***, 963 A.2d 521, 533-534 (Pa. Super. 2008).

and proximity. Thus, no material issue of fact exists to defeat judgment based on this exhibit.

Appellant's next three exhibits, "Exhibit C," "Exhibit D," and "Exhibit E," consist of deposition testimony excerpts from former employees of Goulds Pumps, taken in unrelated cases. Appellant contends that this testimony reveals that Goulds Pumps used asbestos in several of its products, including in gaskets, pump parts, and packing boxes. Plaintiff's Response to Goulds Pumps Motion for Summary Judgment, 11/30/12, at 5-6.

A review of these deposition testimony excerpts reveals that these individuals testified that Goulds Pumps had manufactured and sold products containing asbestos. The deposition of the individual in "Exhibit D" was taken in 1995 in an unrelated case, and the deposition of the individual in "Exhibit E" was taken in 2002. The testimony, however, does not establish that these products were sold to or located at any of the jobsites where Decedent worked.

In reviewing the evidence Appellant presented in an attempt to defeat Goulds Pumps' motion for summary judgment, we cannot conclude that Appellant has established a genuine issue of material fact that asbestos-containing Goulds Pumps' products caused Appellant's mesothelioma. Viewing the evidence of record in the light most favorable to Appellant, we

can conclude that Goulds Pumps' pumps contained asbestos, based on the testimony of the three former Goulds Pumps' employees' testimony.[13]

Appellant has not presented sufficient evidence, however, to establish a genuine issue of material fact as to the presence of Goulds Pumps' pumps at the Decedent's worksites. Nor has Appellant established that the pumps containing asbestos were located at Decedent's worksites. Additionally, Appellant has not presented sufficient evidence establishing Decedent's frequent, regular and proximal exposure to Goulds Pumps' pumps or that Decedent inhaled asbestos fibers from a Goulds Pumps product. Accordingly, the trial court properly granted Goulds Pumps' motion for summary judgment.

In her next issue, Appellant claims that the record reveals a genuine issue of material fact as to whether Appellees Goulds Pumps, American Standard, and Zurn can be "held liable for their inclusion within their own products of asbestos-containing products manufactured by third parties." Appellant's Brief at 53. Appellant asserts that Appellees are liable for products they sold which contained asbestos-containing components. *Id.* at

---

[13] As noted, we are mindful that these depositions were taken, not as part of this case, but rather, in the context of three separate unrelated cases. We shall not consider at this point whether these excerpts are admissible at trial for purposes of establishing that the products actually contained asbestos. At the summary judgment stage of proceedings, however, we are taking the averments presented by Appellant as true and viewing them in the light most favorable to Appellant pursuant to the required standard of review. *Shepard*, 948 A.2d at 856.

56. As a result, Appellant avers that the trial court erred in granting summary judgment in favor of those parties. *Id.*

Despite alleging that these three Appellee companies are liable for products they manufactured and sold that contained asbestos-containing components, Appellant fails to identify with specificity the products and asbestos-containing components at issue. We shall not assume the burden of searching through the lengthy briefs and voluminous record in an attempt to guess at the products and components to which Appellant is referring. "This Court will not act as counsel and will not develop arguments on behalf of an appellant." *Irwin Union Nat. Bank and Trust Co. v. Famous,* 4 A.3d 1099, 1103 (Pa. Super. 2010). It is not this Court's responsibility to comb through the record seeking the factual underpinnings of a claim. *Id.* When deficiencies in a brief hinder our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived. *Id.*; Pa.R.A.P. 2101. Because Appellant failed to clarify the specifics of her component-parts liability claims, we find this claim to be waived. Pa.R.A.P. 2101.

Additionally, the trial court provided the following analysis regarding this claim:

> [T]his Court did not reach the issue of whether or not the aforesaid Appellees were liable for asbestos-containing parts of their respective products, as Appellant failed to establish a *prima facie* case against those Appellees. Specifically, Appellant has

not presented sufficient evidence specifically placing Appellant's [Decedent] in proximity to the aforesaid Appellees' products. In addition, Appellant has not produced sufficient evidence that the aforesaid Appellees' products at the work sites of Appellant's [D]ecedent contained asbestos during the time [D]ecedent worked there, or that Appellant's [D]ecedent inhaled asbestos fibers from those products. Therefore . . . [the] granting of the aforesaid Appellees' Motion for Summary Judgment was proper.

Trial Court Opinion, 10/10/13, at 9.

We agree. Thus, even if Appellant had developed her claim with sufficient specificity regarding the components at issue so that appellate review of the claims was possible, the trial court properly granted the related motions for summary judgment.

In her next claim, Appellant maintains that the record reveals a genuine issue of material fact concerning Decedent's frequent, regular, and proximate exposure to asbestos in American Standard boilers. Appellant's Brief at 56. American Standard filed a motion for summary judgment on the grounds that Appellant failed to offer admissible evidence that Decedent was exposed to asbestos from any products manufactured, supplied or distributed by American Standard. Motion for Summary Judgment on Behalf of Defendant, Trane US Inc. f/k/a American Standard re: Insufficient Product Identification, 11/13/12, at 1.

Appellant maintains that the Mike Morgan Affidavit itself satisfies the **_Eckenrod/Gregg_** standard, defeating summary judgment. Appellant's Brief at 57. Appellant further maintains that the answers to interrogatories

provided by American Standard support the affidavit of Mike Morgan that the boilers contained asbestos. In her response to American Standard's motion for summary judgment, Appellant attached the affidavit of Mr. Morgan, as "Exhibit A"; deposition testimony transcript excerpt of Mike Morgan, as "Exhibit B"; and the interrogatory answers provided by American Standard in an unrelated case, as "Exhibit C". Plaintiff's Response to Trane US Inc. f/k/a American Standard's Motion for Summary Judgment, 11/30/12, "Exhibit A", "Exhibit B", and "Exhibit C".

As explained previously, contrary to Appellant's claim, the Morgan affidavit does not itself satisfy the ***Eckenrod/Gregg*** standard. Moreover, the Morgan affidavit fails to establish that American Standard's boilers were present at Decedent's worksites, for reasons outlined thoroughly above.

The excerpt of Mike Morgan's deposition testimony at "Exhibit B" reflects the following testimony pertaining to American Standard boilers:

> [Counsel]: Now, I'm just going to go a little further with this affidavit that was referenced. Paragraph number three says: At our job sites there were boilers manufactured by American Standard, Foster-Wheeler and Zurn.
>
> Is that an accurate statement?
>
> [Defense Counsel]: Objection; asked and answered.
>
> [Mr. Morgan]: Yes.
>
> [Counsel]: Do you know where the American Standard, Foster-Wheeler and Zurn boilers were in those job sites, or do you just

know that they were at one of those job sites or two of those job sites?

[Defense Counsel]: Objection to form.

[Defense Counsel]: Objection; compound.

[Mr. Morgan]: I don't know exactly where each one of them was, but I know they were there because you can see them, they are everywhere.

[Counsel]: When you say you can see them, I think you may have referenced this before, but what made you say that you were able to identify these boilers?

[Mr. Morgan]: A lot of them have a tag, it's a metal tag that's actually fastened to the boiler itself and they are usually above the manways. So, you know, they open a door to a manway and you go to cut the brick out of them and you can't miss them.

[Counsel]: And was that true with all three of those boilers that you have identified?

[Defense Counsel]: Objection.

[Mr. Morgan]: Yes.

\* \* \*

[Counsel]: And my question goes to rope gaskets for a minute. Did you and [Decedent] become exposed to those asbestos rope gaskets that you testified to?

[Defense Counsel]: Objections; asked and answered.

[Mr. Morgan]: Yes.

\* \* \*

[Counsel]: And how were you exposed to it? . . . [B]oth of you.

[Defense Counsel]: Objection.

[Mr. Morgan]: There was [sic] two different ways. One way is when they removed the steel door, right on the other [side] of that steel door is an asbestos rope gasket, so we were exposed that way, and then once you cut the brick out, the opening, it creates a suction on the inside of the boiler. You go inside the boiler, you know, do what you are supposed to do in there, maybe go in and do an inspection or whatever, and anything that's dropped from up above on the outside is going to be sucked into this hole, to the opening, the manway, and it gets inside the boiler, I mean, you're going to breathe it.

[Counsel]: Would that include dust and other debris from the boiler and the rope gaskets?

[Mr. Morgan]: Yes.

* * *

[Counsel]: And would [Decedent] breathe that in?

[Mr. Morgan]: Yes.

Plaintiff's Response to Trane US Inc. f/k/a American Standard's Motion for Summary Judgment, 11/30/12, "Exhibit B," at 79-82.

Without any specificity, Mr. Morgan testified that American Standard boilers were one of three types of boilers at his worksites. He does not identify a specific worksite where the American Standard boiler was placed. He stated that he knew they were there because "they were everywhere." Moreover, he fails to provide any evidence that he and Decedent were exposed to asbestos from an American Standard boiler. Additionally, although Appellant discusses how he and Decedent could be exposed to the gasket, there is no testimony, at least none provided in this excerpt, as to

the frequency, regularity and proximity to the alleged asbestos-containing gasket.

A review "Exhibit C" reflects a document that contains a caption, "In Re: New York City Asbestos Litigation," in New York State Supreme Court. There is no date on this document. It further indicates that it is "American Standard Inc.'s amended supplemental response to plaintiff's first standard set of liability interrogatories and request for production of documents." Plaintiff's Response to Trane US Inc. f/k/a American Standard's Motion for Summary Judgment, 11/30/12, "Exhibit C," at 1. After the cover sheet, the document begins with page 14. *Id.*

Appellant maintains that these answers to interrogatories establish that American Standard confirmed its purchase, as subsidiaries, of companies which produced boilers that contained asbestos. Plaintiff's Response to Trane US Inc. f/k/a American Standard's Motion for Summary Judgment, 11/30/12, at 4. Appellant also maintains that in these responses, American Standard confirms that it manufactured boilers which contained asbestos. *Id.* at 5.

A review of the responses to interrogatories reflects the following relevant, though lengthy, response:

**Response to Interrogatory No. 9**

American Standard incorporates herein its Preliminary Statement and General Objections set forth above.

American Standard has never engaged in the mining, milling, manufacture, sale or distribution of asbestos or asbestos fiber. It has never manufactured asbestos-containing insulation products. Old product books printed prior to 1930 suggest that rebranded asbestos cement was sold under the trade name "Ideal" during that pre-1930 time period. The corporate histories of "Kewanee" and American-Standard as they relate to the manufacture and sale of boiler and heating products are set forth in the Preliminary Statement and incorporated herein. Because this litigation involves the manufacture and distribution of boiler products manufactured by those divisions since 1930 and through January, 1970 for Kewanee and 1974 for American Standard, these responses are limited to those products. During the relevant times, Kewanee manufactured primarily low pressure steel boilers, some steel boilers with up to 150 lb. working pressure, packaged generators, boiler-burner combinations, and water heaters for a range of uses that did not include ship propulsion or power plant generation. Kewanee's steel boilers were built at its manufacturing plant in Kewanee, IL and shipped as complete to the purchaser's sites. Prior to the 1960's, the only field assembly required on a Kewanee boiler was the mounting of the boiler shell on the frame for larger models. Assembly of non-Kewanee burners or other controls would also be required at the site. Those that were purchased as Kewanee combination boiler-burner units were shipped as a package from the Kewanee, Illinois manufacturing site as a complete combination boiler-burner with no field assembly required. Kewanee sold and distributed its products through independent sales representatives to installation contractors. The contractor would merely locate the boiler and connect it to water, fuel, and electrical sources and internal piping and external exhaust. Kewanee offered metal jackets to insulate certain models as early as 1929 and on all models by the 1960's. Documents reflect that by the 1950's, and possibly earlier, the jacketed boilers were insulated with mineral wool or glass fiber. Kewanee boilers shipped without jackets were shipped bare metal, without insulation or recommendation for the use of insulation. It is not certain what boiler models did contain internal asbestos-containing components, except that a former Kewanee employee has advised that asbestos may have been used in gaskets to seal the manway and hand hold covers in

most models, and in rubberized gaskets on the flue doors and in packing or rope to seal the mounting flange and observation port on forced air burner models. Any such asbestos-containing sealants were cut and installed at the Kewanee factory, and would not give off asbestos fibers during unpacking and setup. According to parts lists, earlier Kewanee boilers may have included small internal components that included asbestos packing or tape. It is not clear whether jacketed boilers manufactured prior to 1950 contained insulation and, if so, whether it contained asbestos. After the sale of Kewanee Boiler in January 1970, any boilers manufactured and sold in the name of "Kewanee" or "Kewanee Boiler Corporation" were manufactured by Kewanee Boiler Corporation, an entity unrelated to American Standard. For the reasons stated in the Preliminary Statement, some boilers sold prior to January, 1970 under the name "Kewanee" were manufactured, distributed, licensed, and sold by Kewanee Boiler Company, a New York corporation, or its successors, which entity was not in any way related or otherwise connected to Kewanee Boiler Corporation, Kewanee-Ross Corporation, or American-Standard.

American-Standard's United States Plumbing and Heating Products Division (later known as the "Hydronics Division") manufactured a completely different line of relatively small, low pressure cast-iron boilers/burners, furnaces, and winter air-conditioners for use in residential and smaller commercial, institutional and industrial settings. Such boilers were not engineered for and were unsuited for use in ship propulsion, power plant generation, or other large industrial facilities. As noted, prior to 1930, American Standard marketed boilers under the trade name "Ideal". American Standard did not supply asbestos cement with any of its boilers sold after 1930 (one model 1939 furnace shipped cement as standard equipment). A mix of Portland and asbestos cements was recommended to seal the line along the base of the sections and top of the combustion chamber and/or along the floor of some models of sectional boilers. From 1930 until approximately 1949-50, several different product lines were marketed under the name American Radiator and Standard Sanitary Corporation. In approximately 1950, the Company began to market its line of boilers exclusively under the trade name American-Standard. Its line of products changed during those same time periods. Between

1930 and 1950, all oil and gas-fired products were jacketed and coal-fired burners had optional jackets. Aircell asbestos was used inside the jackets for some product models. Any boiler shipped without a jacket was shipped bare metal, without insulation. After World War II and by 1950, American Standard renewed its entire product line, using fiberglass as the insulating material inside the jacket. By 1950, every boiler manufactured by American Standard was offered with a metal jacket with fiberglass insulation. Oil and gas-fired units required fiberglass-insulated metal jackets, because they were designed and tested with those jackets to meet applicable safety and performance standards. Coal-fired boilers were not tested with jackets. However, if a contractor wanted to install an insulated coal-fired boiler, it could purchase a factory-built jacketed boiler that was less expensive and easier to install and functionally more efficient than unjacketed version that he would have to insulate at the installation site. Thus, non-jacketed coal-fired boilers were rarely, if ever, ordered after 1950. American Standard built and shipped smaller units from the factory as complete packaged units. Larger boilers were shipped in sections for assembly and jacketing in the field. American Standard boilers were specially machined so that they did not require rope to seal the sections, as did some competitor models. Documents reflect that prior to 1950, some models and some lines had small amounts of precut, generally factory-installed materials, including gaskets, cement, wick, rope, board, tape, wire, or paper inside the boiler. With the exception of a one inch precut asbestos board in the base of the combustion chamber of a model of oil-fired boiler, boilers sold after 1950 did not use any asbestos insulating material inside or outside the boilers. Pre-cut gaskets, wire, or cushions were used on pressure plate burner connections on some oil burners. Gasket, wick, or rope were used as sealant for high temperature air-tight connections on some models. Some product brochures indicate that a piece of asbestos wick or tape was used to seal the canopy on some models; however, persons familiar with those products and product lines recall that non-asbestos boiler putty was used for that purpose.

Plaintiff's Response to Trane US Inc. f/k/a American Standard's Motion for Summary Judgment, 11/30/12, "Exhibit C," at 17-20.

This response compels several important conclusions.  The response is limited to products manufactured by Kewanee from 1930 through January 1970 and by American Standard from 1930 through 1974.  As indicated, it is not clear which Kewanee boilers contained internal asbestos-containing components, except there was some evidence from a former employee that asbestos may have been used in gaskets.  Although not defined, it appears that the Kewanee boilers were sold under that brand name, and not under "American Standard."

In approximately 1950, the company began to market its line of boilers exclusively under the trade name American-Standard.  Between 1930 and 1950, aircell asbestos was used inside the **optional** insulation jackets for **some** coal-fired boiler product models.  After World War II and by 1950, American Standard renewed its entire product line, using fiberglass as the insulating material inside the jacket.  By 1950, every boiler manufactured by American Standard was offered with a metal jacket with fiberglass insulation.  Coal-fired boilers were rarely, if ever, ordered after 1950.

Additionally, American Standard boilers were specially machined so that they did not require rope to seal the sections, as did competitor models.  Prior to 1950, some models and some lines had small amounts of precut, factory-installed asbestos materials.  With the exception of a one-inch precut asbestos board in the base of the combustion chamber of a certain model of

an oil-fired boiler, boilers sold after 1950 did not use any asbestos insulating material inside or outside the boilers.

Moreover, we note that there is no evidence establishing that these products were at the Decedent's worksites. The answers establish that the Kewanee line of boilers may have contained asbestos. However, Mr. Morgan testified that the boiler he observed, although he was unable to say where he saw it, was made by American Standard, and he could positively identify it due to the tag on it. Thus, it was not a Kewanee boiler that he observed.

Additionally, not all boilers manufactured by American Standard, in fact very few after 1950, contained asbestos. There is no evidence that an American Standard boiler, if at Decedent's worksite, was one that contained asbestos. Mr. Morgan testified that he and Decedent were exposed to asbestos as a result of the asbestos-containing gaskets being changed. The American Standard interrogatory establishes that their boilers did not require rope to seal the sections, as did competitor boilers.

Thus, there is no evidence of record creating a genuine issue of material fact that Decedent was exposed to asbestos-containing American Standard boilers, with the requisite frequency, regularity, and proximity to have caused his mesothelioma. Consequently, the trial court properly granted summary judgment in favor of American Standard.

In her final claim, Appellant asserts that the trial court erred in granting summary judgment in favor of Zurn Boilers. Appellant's Brief at 62. Zurn filed a motion for summary judgment on the grounds that Appellant failed to present any evidence that Decedent worked on or around asbestos-containing products manufactured, supplied, or distributed by Zurn. Motion for Summary Judgment on Behalf of Defendant, Zurn Industries re: Insufficient Product Identification, 11/13/12, at 3, 5.

In her response to Zurn Industries' motion for summary judgment, Appellant asserted that Decedent had direct exposure to asbestos-containing boilers sold by Zurn. Plaintiff's Response to Defendant Zurn Industries' Motion for Summary Judgment, 11/30/12, at 3. In an attempt to establish this claim, Appellant attached "Exhibit A," the affidavit of Mike Morgan, and "Exhibit B," an excerpt from Mike Morgan's deposition testimony.

For reasons outlined previously, we conclude that the Mike Morgan affidavit, attached as "Exhibit A," is insufficient to establish that Zurn boilers were located at the worksites where Decedent had worked.

A review of the deposition testimony excerpt, attached as "Exhibit B," reveals the following testimony:[14]

---

[14] We note that the excerpt of the deposition testimony is fragmented in that the pages supplied are not consecutive. Thus, it is sometimes difficult to identify the products to which Mr. Morgan is referring because we cannot refer to the previous page.

[Counsel]: Do you know where the American Standard, Foster-Wheeler and Zurn boilers were in those job sites, or do you just know that they were at one of those job sites or two of those job sites?

[Defense Counsel]:     Objection to form.

[Defense Counsel]:     Objection; compound.

[Mr. Morgan]:     I don't know exactly where each one of them was, but I know they were there because you can see them, they are everywhere.

[Counsel]: When you say you can see them, I think you may have referenced this before, but what made you say that you were able to identify these boilers?

[Mr. Morgan]:     A lot of them have a tag, it's a metal tag that's actually fastened to the boiler itself and they are usually above the manways. So, you know, they open a door to a manway and you go to cut the brick out of them and you can't miss them.

Plaintiff's Response to Defendant Zurn Industries' Motion for Summary Judgment, 11/30/12, "Exhibit B," at 80.

The above testimony was the only testimony offered through the deposition excerpt provided by Appellant in identifying the Zurn boilers at the worksites where Decedent worked. Mr. Morgan testified simply that he knew that three "makes" of boilers were at the various worksites because they were "everywhere." He was not able to identify which boiler was at which worksite. Thus, Mr. Morgan's testimony that Zurn boilers were at the worksites was speculative and vague. Furthermore, previously in his testimony, he stated that there were times when he and Decedent did not

work in the same place in the factory. Thus, we cannot conclude that Mr. Morgan's testimony regarding Zurn boilers was sufficient to establish even an issue of material fact as to their placement at the various worksites.

Additionally, Appellant has failed to establish that Zurn boilers contained asbestos. The only evidence presented in an attempt to establish the presence of asbestos is Mr. Morgan's single statement that "those rope gaskets were used on just about every boiler we ever opened." Plaintiff's Response to Defendant Zurn Industries' Motion for Summary Judgment, 11/30/12, "Exhibit B," at 85. However, Mr. Morgan does not identify the gaskets as being on the Zurn boilers, nor is there testimony that the rope gaskets contained asbestos.

Furthermore, Mr. Morgan presents no testimony through his deposition establishing that Decedent worked frequently and regularly in proximity to an asbestos-containing product manufactured by Zurn Industries. Thus, pursuant to **Eckenrod** and **Gregg**, the trial court properly granted summary judgment in favor of Zurn Industries.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/22/2014