J-S56032-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JULIE TRYBOSKI, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| THE PENNSYLVANIA STATE UNIVERSITY, | |
| Appellee | No. 124 MDA 2015 |

Appeal from the Order Entered December 16, 2014
in the Court of Common Pleas of Centre County
Civil Division at No.: 2011-4909

BEFORE:  SHOGAN, J., JENKINS, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED NOVEMBER 09, 2015**

Appellant, Julie Tryboski, appeals *pro se* from the order of the court of common pleas granting the motion for summary judgment of Appellee, The Pennsylvania State University, and dismissing her amended complaint with prejudice.  We affirm.

We take the following background from this Court's April 1, 2013 memorandum opinion:

> In August 1995, Appellant was accepted into a doctoral program with the Communications Arts and Sciences Department of Penn State.  By 2000, Appellant began work on her dissertation.  Professor J. Michael Hogan served as Appellant's graduate advisor and chair of her dissertation

---

[*] Retired Senior Judge assigned to the Superior Court.

committee. Under the program rules, a student who did not complete his or her dissertation within six years of passing required comprehensive examinations must retake the examinations to remain viable in the program. Appellant did not complete her dissertation by her deadline of October 8, 2005, having only turned in a first draft that month.

Arrangements were made for Appellant to retake her comprehensive examinations on February 1, 2006. Additionally, Appellant sought a retroactive two-year medical withdrawal, which she hoped would effectively extend the deadline for completion of her dissertation. On February 17, 2006, Graduate School Associate Dean Mark Wardell advised Appellant that the six-year deadline was not contingent on registration, and a medical withdrawal would not affect her need to retake her comprehensive examinations. It was subsequently approved for Appellant to retake her comprehensive examination in the fall of 2006.

In May and June 2006, Appellant sent e-mails to Professor Hogan detailing her dissatisfaction with the decision and advancing various criticisms of his performance as her advisor. On June 5, 2006, Professor Hogan resigned as Appellant's advisor, and from her dissertation committee, citing a lack of collegiality. Appellant was promptly notified of Professor Hogan's resignation and advised that a replacement advisor needed to be found. Unknown to Appellant at the time, two other committee members resigned on June 6, 2006, and the remaining member resigned on July 25, 2006. Neither Appellant's own efforts, nor efforts made on her behalf by the Department and the University administration, succeeded in securing a replacement advisor. Consequently, on August 4, 2006, Communications Arts and Sciences Department Head, Professor James P. Dillard sent a letter to Appellant, informing her that her "program of study in Communications Arts and Sciences has reached its end as of August 1, 2006." (Appellant's Amended Complaint, 2/21/12, Appendix K).

Appellant did not make a timely request for a departmental appeal of her dismissal. However, on January 31, 2007, Appellant filed a discrimination complaint with the Pennsylvania Human Relations Commission. On November 12, 2009, the Commission dismissed Appellant's complaint. On November 4, 2011, Appellant filed a *pro se* complaint with the Court of

- 2 -

Common Pleas of Centre County, alleging sexual discrimination under the Pennsylvania Human Relations Act (PHRA). On December 21, 2011 Penn State filed preliminary objections. The trial court sustained Penn State's preliminary objections on February 2, 2012, and permitted Appellant leave to file an amended complaint within 20 days.

Appellant timely filed her *pro se* amended complaint on February 21, 2012. On March 9, 2012, Penn State filed renewed preliminary objections raising various issues, including a demurrer alleging Appellant failed to state a *prima facie* case of gender discrimination. On June 5, 2012, the trial court sustained Penn State's preliminary objection in the nature of a demurrer and dismissed Appellant's complaint with prejudice. On June 14, 2012, Appellant filed a motion for reconsideration, which the trial court denied on June 19, 2012. Appellant filed a timely notice of appeal on July 5, 2012.

(***Tryboski v. Penn State Univ.***, No. 124 MDA 2015, unpublished

memorandum, at *1-*4 (Pa. Super. filed April 1, 2013)) (footnotes omitted;

parentheses added).

As further detailed by the trial court in its December 16, 2014 opinion:

On April 1, 2013, the Superior Court reversed and remanded, indicating that the trial court had erroneously determined that [Appellant] had failed to plead sufficient facts to show that she is qualified for the position and failed to plead sufficient facts to show she was discharged under circumstances that gave rise to an inference of discrimination. . . .

On February 6, 2014, [Appellee] filed its Answer and on February 24, 2014, [Appellant] filed a Reply. On September 30, 2014, [Appellee] filed a Motion for Summary Judgment along with a statement of material facts and relevant documents. [Appellant] filed a brief in opposition to summary judgment on November 11, 2014 along with relevant documents. [Appellee] thereafter submitted a reply brief. A hearing was held December 1, 2014.

(Trial Court Opinion, 12/16/14, at 2).

On December 16, 2014, the trial court granted Appellee's motion for summary judgment based on its finding that "Professor Hogan's stated reasons for resigning were not a pretext for gender discrimination." (***Id.*** at 11). The trial court denied Appellant's motion for reconsideration. Appellant timely appealed.[1]

Appellant raises one issue for our review:

> 1.    Did the trial court error [sic] in granting [Appellee's] Motion for Summary Judgment because the court improperly held that [Appellant's] evidence failed to establish that genuine issues of material fact remain as to whether [Appellee's] averred reasons for discharging her were pretextual because the court improperly weighed conflicting evidence and failed to draw all inferences in the light most favorable to [Appellant]?

(Appellant's Brief, at 2).[2]

---

[1] Appellant filed a timely statement of errors on appeal on February 11, 2015 pursuant to the court's order. ***See*** Pa.R.A.P. 1925(b). The court filed a Rule 1925(a) opinion in which it relied on the reasons stated in its December 16, 2014 opinion. ***See*** Pa.R.A.P. 1925(a).

[2] As a preliminary matter, we observe that Appellant's brief is forty-one meandering pages long, and does not contain a certification that it is not in excess of 14,000 words, as required by Pennsylvania Rule of Appellate Procedure 2135. (***See*** Appellant's Brief, at 1-41); ***see also*** Pa.R.A.P. 2135(a)(1), (d). Additionally, the argument section of the brief is flawed. First, other than a citation to one binding United States Supreme Court case, the argument section of the brief only cites law from the Commonwealth Court and lower federal courts. (***See*** Appellant's Brief, at 11-40). However, we can consider this authority as persuasive, even if not binding. ***See Cresci Const. Serv., Inc. v. Martin***, 64 A.3d 254, 256 n.3, 258 n.7 (Pa. Super. 2013) (Decisions of Commonwealth Court and lower federal courts not binding, but provide persuasive authority and guidance). Also, the vast majority of this section contains a self-serving, tortuous recitation of the underlying facts of this case, rather than pertinent discussion, in violation of
*(Footnote Continued Next Page)*

Our standard and scope of review of a court's order granting a motion for summary judgment is well-settled:

> A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.
>
> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the nonmoving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Krauss v. Trane U.S. Inc.*, 104 A.3d 556, 562-63 (Pa. Super. 2014) (case citation omitted).

> Established for Title VII cases, where, as here, direct evidence of discriminatory treatment is lacking, is "an allocation of the burden of production and an order for the presentation of proof" according to which a court may assess a plaintiff's indirect evidence of discrimination. This Title VII burden-shifting framework as developed in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973),] is a three-part one. First, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. The burden on the plaintiff of presenting a

_____

*(Footnote Continued)* ―――――――――――――

Rule 2119(a). (**See** Appellant's Brief, at 15-40); **see also** Pa.R.A.P. 2119(a). However, although Appellant fails to clearly explain her argument, we will consider it on the merits to the extent possible.

*prima facie* case under **McDonnell Douglas** is minimal. If the plaintiff cannot meet this minimal burden, the employer is entitled to judgment as a matter of law.

If the plaintiff does establish a *prima facie* case, a presumption of discrimination arises, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. . . . If the employer articulates a legitimate business explanation, then the presumption of discriminatory intent created by the employee's *prima facie* case is rebutted and the presumption simply drops out of the picture.

If the employer satisfies its burden of production, the third and final part of the **McDonnell Douglas** framework gives the plaintiff the opportunity to show that the legitimate reasons proffered by the employer were pretexts for what, in reality, was a discriminatory motivation. In the pretext discrimination case, the employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff.

**Kroptavich v. Penn. Power and Light Co.**, 795 A.2d 1048, 1055 (Pa. Super. 2002) (citations omitted; some quotation marks omitted).[3]

Here, Appellant seeks to hold Appellee liable for terminating her because its stated reasons for doing so were inconsistent, and resulted from the alleged discriminatory actions of her advisor, its employee, Professor Hogan. (**See** Appellant's Brief, at 15). Specifically, she states that "[she] has offered evidence supporting the fact that the demise of her PhD

---

[3] As stated previously, a panel of this Court found that Appellant stated a *prima facie* case. (**See** Trial Ct. Op., at 2). The only prong at issue in this appeal is the third prong, *i.e.*, whether the trial court properly found that Appellant failed to establish pretext. (**See** Appellant's Brief, at 12).

aspirations was a *fait accompli* once Prof. Hogan's animus infected the process. (There are, thus, issues of fact as to 'cat's paw' liability sufficient to avoid summary judgment[.] . . .)." (***Id.*** at 16). Appellant's claim does not merit relief.

In ***Staub v. Proctor Hosp.***, 562 U.S. 411 (2011), the United States Supreme Court held that, under the cat's paw theory, "[i]f a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." ***Staub***, ***supra*** at 422 (footnote and emphasis omitted).

However, as aptly discussed by the trial court in this case, Appellant failed to create a genuine issue of material fact regarding whether Professor Hogan acted with discriminatory intent when he resigned, much less about if he intended her termination. Specifically, the trial court observed:

> [Appellant] did not raise a material issue by casting substantial doubt on Professor Hogan's proffered reasons for resigning or by coming forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of his decision to do so. [Appellant] argues that Professor Hogan relied on "ingrained sex stereotypes, particularly the ones that anger and assertiveness are unacceptable in women" when he decided to resign as her advisor after receiving her email on June 5, 2006. In support of her argument, [Appellant] presented emails wherein Professor Hogan and Dr. Dillard referred to the June 5, 2006 email as "combative" and "aggressive." Additionally, discovery revealed emails wherein Professor Hogan writes critically of [Appellant]. For example, on October 5, 2005, Professor Hogan sent an email to Dr. Dillard wherein he said that "the decision NOT to take a forceful stand

- 7 -

and terminate [Appellant] back in November of 2005 is coming back to haunt us." Similarly, on April 13, 2004, Professor Hogan stated in another email to administration that "if [Appellant's] past behavior is any indication, she'll try to blame us [for her situation]." Despite the fact that it is clear Professor Hogan did not have a great deal of respect for [Appellant] leading up to his resignation, the [c]ourt cannot find any evidence in the record that his feelings toward [Appellant] were a result of gender discrimination. The evidence shows that Professor Hogan eventually resigned due to his long history with [Appellant], including her failure to adhere to his expectations of graduate students. For example, [Appellant's] draft dissertation arrived to Professor Hogan on October 5, 2005—three days before her deadline—though she had sent him the same draft by email two weeks earlier. Professor Hogan does not accept dissertations by email and thus did not consider the emailed draft a submission. He therefore did not have sufficient time to review her draft, suggest edits to her, and allow her to revise it before the rest of her committee reviewed it by the deadline.

[Appellant] also presented comparator evidence. Professor Hogan told another female student, Corinne Weisberger, that he treated seeking one's request to view comprehensive exam scores as an "adversarial action." In an email in June 2002, Professor Hogan also told Corinne Weisberger that he was "becoming increasingly concerned. about [her] apparent obsession with these perceived past injustices" in reference to the student's desire to see her scores on her comprehensive exams. While the correspondence between Professor Hogan and Corinne Weisberger was tense—like much of [Appellant's] correspondence with Professor Hogan—the [c]ourt finds no evidence of pretext in it. [Appellant] additionally presented evidence regarding a male student, George Elder, who spoke out publically against the [d]epartment but was not terminated. Notably, Mr. Elder had a different advisor and committee members, with the exception of Professor Johnstone. Upon consideration of all of [Appellant's] evidence, the [c]ourt finds that Professor Hogan's proffered reasons for his resignation—the eventual demise of their working relationship—to be credible. [Appellant] argues that she was continually penalized with a difficult dissertation, a hostile adviser, and persistent poor health. These arguments cut against her theory that Professor Hogan resigned because she failed to adhere to sex stereotypes, but instead bolster Professor Hogan's stated reasons for

resigning. [Appellant] failed to "cast substantial doubt" on Professor Hogan's legitimate, nondiscriminatory reasons for resigning from her committee. In other words, the [c]ourt finds that Professor Hogan's stated reasons for resigning were not a pretext for gender discrimination. . . .

(Trial Ct. Op., at 10-11) (citation omitted).

After our independent review of the record, we agree with the trial court that Appellant failed to adduce sufficient evidence to raise a genuine issue of material fact regarding whether Professor Hogan's stated reasons for resigning were merely a pretext for gender discrimination. **See Krauss**, **supra** at 562-63; **Kroptavich**, **supra** at 1055.

Appellant's amended complaint alleges, in pertinent part, that, "Prof. Hogan, in making his decision to resign, and in citing a 'lack of collegiality,' illegally relied on deeply ingrained sex stereotypes, particularly the ones that anger and assertiveness are unacceptable in women," and that "[his] interest in collegiality was . . . a pretext to cover his discriminatory animus toward [Appellant]." (Amended Complaint, 2/21/12, at 5 ¶ 33, 16 ¶ 76). However, none of the numerous exhibits in the certified record support her allegation.

For example, at her deposition, when repeatedly asked if she had any evidence that Professor Hogan "relied on the deeply ingrained stereotypes" alleged in her complaint, Appellant consistently replied in the negative. (N.T. Appellant's Deposition, 3/28/14, at 125, 127; **see id.** at 126). She also admitted that she did not have any evidence that Professor Hogan

treated the female students whom he advised differently than the males. (**See id.** at 128-29). Further, in spite of her allegation that Professor Hogan used "lack of collegiality" as a pretext, she admitted that the June 5, 2006 email she sent to him was angry and confrontational. (Amended Complaint, 2/21/12, at 5 ¶ 33; **see id.** at 16 ¶ 76; N.T. Appellant's Deposition, at 128). Finally, although Appellant asserts that her entire doctoral committee resigned at the urging of Professor Hogan, she admitted at her deposition that she does not have any evidence of that. (**See** N.T. Appellant's Deposition, at 133-37).

Indeed, a review of the email communications between Appellant and Professor Hogan reveal a history of an antagonistic relationship between the two that certainly could be characterized as lacking collegiality, but do not even suggest discrimination. (**See, e.g.**, Amended Complaint, Appendix F, Email Exchange Between Appellant and Professor Hogan, 5/30/06-6/05/06); **id.** at Appendix S, Email Exchange Between Appellant and Professor Hogan, 2/26/04-2/27/04; Appellee's Motion for Summary Judgment, Appendix 7, Documents Provided in Discovery, Exhibit G1, Email Exchange Between Appellant and Professor Hogan, 2/07/02-2/11/02; **id.** at Exhibit G3, Email Exchange Between Appellant and Professor Hogan, 8/23/02-8/24/02; **id.** at Exhibit H1, at unnumbered pages 3-6, Email Exchange Between Appellant and Professor Hogan, 9/23/04-9/24/04; **id.** at Exhibit I6, Email Exchange Between Appellant and Professor Hogan, 11/28/05-12/05/05).

Also, we also find no abuse of discretion in the trial court's characterization of the comparator evidence. (*See* Trial Ct. Op., at 11; *see also* Amended Complaint, Appendix I, Letter from Dr. George H. Elder to Trial Court, 12/29/11; *id.* at Appendix J, Samples of Elder's Editorials and Controversies at Penn State; *id.* at Appendix P, Email from Corinne Weisgerber to Appellant, 8/24/07, at 1). The email sent from Corinne Weisgerber to Appellant claimed that she and Professor Hogan had a contentious relationship, but did not contain any allegation of gender discrimination. (*See id.* at Appendix P, Email from Corinne Weisgerber to Appellant, 8/24/07, at 1). Dr. Elder is a male who had a different advisor than Appellant and spoke against the school. (*See id.* at Appendix I, Letter from Dr. George H. Elder to Trial Court, 12/29/11; *id.* at Appendix J, Samples of Elder's Editorials and Controversies at Penn State).

In short, Appellee discontinued Appellant's doctoral program for her failure to meet its requirements. Appellant did not provide one piece of evidence that would link her termination to her speculation that Professor Hogan resigned, persuaded other committee members to resign, and rendered her somehow unable to meet the requirements of the doctoral program on the basis of gender bias. Therefore, the trial court properly found that Appellant failed to meet her burden of proving that there is a genuine issue of material fact regarding whether Professor Hogan's stated

reason for resigning as her advisor was pretext for discrimination.[4]  **_See_**

**_Kroptavich_**, **_supra_** at 1055.

Hence, after our own independent review, we conclude that the trial court did not abuse its discretion or commit an error of law when it granted Appellee's motion for summary judgment where it is entitled to judgment as a matter of law.  **_See Krauss_**, **_supra_** at 562-63.  Appellant's issue lacks merit.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/9/2015</u>

---

[4] Although Appellant baldly accuses many members of Appellee's faculty of not acting in her best interest and conspiring against her, she does not allege that their actions were premised on their own gender discrimination. (**_See_** Appellant's Brief, at 16-40).