J-S22029-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | | |
|---|---|---|---|
| J.E.O. | : | IN THE SUPERIOR COURT OF | |
| | : | PENNSYLVANIA | |
| Appellant | : | | |
| | : | | |
| | : | | |
| v. | : | | |
| | : | | |
| | : | | |
| T.O. | : | No. 271 MDA 2021 | |

Appeal from the Order Dated January 4, 2021
In the Court of Common Pleas of Lackawanna County Civil Division at
No(s):  2014-FC-40988

BEFORE:     PANELLA, P.J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:                    **FILED AUGUST 30, 2021**

In this custody matter, J.E.O. (Father), who is incarcerated, appeals *pro se* from the order entered in the Lackawanna Court of Common Pleas, denying his request for contact with his son, T.O. (Child), born in October of 2006.[1] After careful review, we affirm.

## I.  Facts & Procedural History

Father last had contact with Child in March 2011, when Child was four years old.  N.T. Master's Hearing, 11/20/19, at 13.  Since April 2011, Father has been incarcerated on a sentence of 13½ to 29 years' incarceration, for

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Child's mother, T.O. (Mother), also appeared *pro se* in the proceedings below, and she has not filed a brief in this appeal.

jury convictions of aggravated indecent assault of a child, indecent assault of a person less than 13 years of age, endangering the welfare of a child, and corruption of minors.[2] *See id.* at 10, 13-15. The victim of these crimes is Child's older half-sibling — Mother's daughter — and the two children maintain a close relationship. *See id.* at 21, 25.

On August 6, 2014, Father filed a *pro se* custody petition, requesting visits with Child, phone contact, photos, and the right to send and receive letters. Mother filed her own *pro se* custody petition on January 27, 2015, in which she requested that Father have no contact with Child. The trial court scheduled a conciliation conference but then issued an order dated April 28, 2015, continuing the matter generally and stating Father would need to schedule a hearing.

The next activity on this custody docket was Father's filing a second *pro se* custody petition on August 22, 2017, again requesting phone contact with Child, permission to send and receive letters, and information regarding Child's medical, academic, and extracurricular information. On April 20, 2018, Father filed a third *pro se* custody petition, generally requesting the same relief.

_____

[2] Both the judgment of sentence and the denial of Father's first Post Conviction Relief Act petition have been affirmed by this Court.

After additional continuances, the master scheduled hearings for February 13 and April 3, 2019. Mother did not appear at either hearing, and on June 25th, the master filed a report and recommendation, holding Father's custody petition in abeyance pending another evidentiary hearing, so that both parties could testify. Trial Ct. Op., 4/6/21, at 2.

The master conducted another hearing on November 20, 2019, at which Father participated *pro se* via telephone and Mother appeared *pro se* in person. At this time, Child was 13 years old and, as stated above, had not had any contact with Father for nine years. N.T. at 31. Father testified it was in Child's best interest to have "a father and son relationship" with him, despite Father's incarceration, and that Father's criminal case "has nothing to do with" Child. *Id.* at 5, 6. Father stated he was not requesting in-person visits at the prison, but rather wished to have a weekly phone call and mail correspondence with Child, and to receive information about Child's health and academics. *Id.* at 35.

Mother testified about the last contact Child had with Father, in March of 2011. Father was "pulling [Child] out of" her car, while "complete stranger bystanders help[ed them] and lock[ed them] in their car to get away from" Father. N.T. at 17. Mother presented a police report, and read aloud a witness' statement included therein:

> She [sic] came out of the convenient and man was kicking car window [sic]. I talked to him, asked him to stop. He stopped, and then went to back door and removed child. He had his hands around [Child's] neck. I grabbed [Child] around his waist and

- 3 -

pulled him into me. I took [Child] to my car with his mother. [Father] then hit [another] bystander, in face, got into his truck and left. . . .

*Id.* at 17-18. Father stated he pleaded guilty to disorderly conduct because of this incident. *Id.* at 36. At this time, Mother was not aware of the sexual abuse by Father against her daughter. *Id.* at 17-18.

Mother then testified that as a result of this incident, she obtained a Protection from Abuse (PFA) order, which included her and both children as protected parties. N.T. at 17-19. However, Father violated the PFA order "multiple times." *Id.* at 18. Mother explained Father posted "a huge cardboard sign up on the pole where [she] work[ed]," as well as signs "all along" a particular road "saying to drop everything, [Child's] my son, you're not going to get away with this." *Id.* at 18-19. One sign included a family photo of Father, Mother, and both children. *Id.* at 19. Father also sent Mother and Child "multiple letters a week." *Id.* at 20. Mother testified she successfully pursued contempt findings against Father at least twice, resulting first in six months' probation "and maybe a fine" and then six months' incarceration. *Id.* at 19-20.

Finally, Mother testified to the following: Child was aware that Father was incarcerated because he "violated his sister." N.T. at 33. Child participated in therapy and art therapy "on and off [for] a couple years," due to a belief that "it was his fault" that Father was incarcerated. *Id.* at 20. Child also feels guilt and "has emotional problems because he was unable to help

his sister at the time." *Id.* at 33-34. Child has a close relationship with his half-sibling, as well as his half-sibling's father.[3] *Id.* at 25. Mother opined that contact with Father was not in Child's best interest, and forcing this contact would be "terrible" because of the guilt Child would experience, as well as the feeling of "betraying" his half-sibling. *Id.* at 16, 21-22, 25-27. Mother also stated that in letters to Child, Father claimed innocence of the sexual abuse charges; however, Mother has not given Child any of the letters from Father. *Id.* at 27. Throughout the hearing, Father similarly claimed innocence and stated the Innocence Project was assisting him. *Id.* at 10, 11, 28.

On March 30, 2020, the master filed a report and recommendation, reviewing the Child Custody Act Section 5328 general custody factors, as well as Section 5329's factors invoked when a party has been convicted of certain offenses.[4] The master recommended that Father's request for contact with Child be **denied**. Notably, the report and recommendation included a notice to file exceptions within 20 days. Instead, on May 29th (60 days after the report), Father filed a petition for reconsideration, claiming his participation at the November 20, 2019, hearing was inadequate, requested videoconference hearings at which Child would be present, and renewed his request for various

---

[3] The half-sibling lives with her father, close to Mother. N.T. at 25. Mother lives with Child and her significant other. *Id.* at 32.

[4] *See* 23 Pa.C.S. §§ 5328(a), 5329.

- 5 -

forms of contact with Child. The trial court did not respond to Father's petition, and Father filed an "objection" to the master's report and recommendation on December 11, 2020. In his objection, Father requested that the court remove the master due to alleged bias.

The trial court entered the underlying order on January 4, 2021, denying Father's petition for reconsideration and objection to the master's report. The court also adopted the master's report and recommendation as a final order of court. Fifty days later, on February 23, 2021, Father filed a *pro se* "notice of appeal *nunc pro tunc*," along with a Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on appeal. The court responded with an order dated February 24th, which directed Father to file a petition for leave to appeal *nunc pro tunc* and, although he had already filed one, a concise statement of errors complained of on appeal. Father did not comply with the court's order.

## II. Timeliness of Notice of Appeal

Given the procedural irregularities of this case, we first review the timeliness of Father's notice of appeal. An appellant must file a notice of appeal "within 30 days after the entry of the order from which the appeal is taken," Pa.R.A.P. 903(a), or else this Court lacks jurisdiction to review the appeal. *In re J.M.P.*, 863 A.2d 17, 19 (Pa. Super. 2004). Critically, "[t]he date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P.

236(b)." Pa.R.A.P. 108(b). Rule of Civil Procedure 236(b), in turn, provides: "The prothonotary shall note in the docket the giving of the notice and, when a judgment by confession is entered, the mailing of the required notice and documents." Pa.R.C.P. 236(b). If no indication appears on the docket that notice was given, a breakdown in the court's operations has occurred, and the 30-day appeal period does not begin to run. *See Frazier v. City of Philadelphia*, 735 A.2d 113, 115 (Pa. 1999) ("[A]lthough Frazier received notice of the . . . judgment, because there was no corresponding entry in the docket, formal entry of the order did not occur under the rules, and the appeal period was not triggered.").

On March 29, 2021, this Court entered a *per curiam* order, observing that the trial docket entry for January 4th order did not indicate that the order was sent to Father. In its opinion, the trial court clarified that: (1) it did contemporaneously send copies of its order to Father at his SCI-Huntington address, as well as two other addresses he provided for purposes of service; and (2) on April 1, 2021, the court clerk "recertified the court docket with notations of the dates the parties were notified[.]"[5] Trial Ct. Op. at 1 n.1. However, this amended docket entry remains noncompliant with our rules. *See Carr v. Michuk*, 234 A.3d 797, 805-06 (Pa. Super. 2020) ("A

---

[5] The docket entry now states, "ORDER DATED 1/4/21. JK MUNLEY [trial judge] NOTIFIED 4/1/2021."

prothonotary should make a notation that specifically states, for example, 'Rule 236 notice provided on' followed by the date the notice was given . . . . Anything short of such a notation constitutes a failure by the prothonotary to comply with . . . Rule 236, and is a breakdown in court operations."). Instead, we conclude that because the original docket entry did not indicate that notice was given — notwithstanding the trial court's explanation that the order was indeed sent to him — the 30-day appeal did not begin to run. Therefore, Father's February 23, 2021, notice of appeal was timely filed. **See Frazier**, 735 A.2d at 115. This Court thus has jurisdiction to review Father's appeal.[6]

### III. Deficiencies in Father's Brief

At this juncture we consider the form and sufficiency of Father's *pro se* brief. The entire brief consists of two-and-a-half pages of numbered sentences. There are no headings nor any of the required sections of an appellate brief. **See** Pa.R.A.P. 2111 (appellant's brief shall include, *inter alia*, a statement of questions involved, statement of the case, and argument). Furthermore, the brief does not include any citation to or discussion of relevant legal authority. **See** Pa.R.A.P. 2119(a); **In re M.Z.T.M.W.**, 163 A.3d 462,

---

[6] We note the trial court also asserts Father failed to timely file exceptions to the master's report and recommendation. **See** Trial Ct. Op. at 7-9. We cannot agree, as the trial court's docket likewise fails to indicate the report, or the notice to file exceptions, was sent to Father. In the interest of justice, we construe Father's May 29, 2020, petition for reconsideration and December 11, 2020, objection to the master's report as timely attempts to file exceptions.

465 (Pa. Super. 2017) (this Court will not review a claim unless it is developed and supported by citation to relevant legal authority). If the defects in an appellant's brief are substantial, this Court may dismiss the appeal. Pa.R.A.P. 2101; *see also Krauss v. Trane U.S. Inc.*, 104 A.3d 556, 584 (Pa. Super. 2014) ("When deficiencies in a brief hinder our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived.").

We remind Father:

"[A]lthough this Court is willing to liberally construe materials filed by a *pro se* litigant, *pro se* status confers no special benefit upon the appellant." "To the contrary, any person choosing to represent himself in a legal proceeding must, to a reasonable extent, assume that his lack of expertise and legal training will be his undoing."

*S.S. v. T.J.*, 212 A.3d 1026, 1032 (Pa. Super. 2019) (citations omitted).

Here, the defects in Father's brief are substantial. Nevertheless, the trial court has provided an opinion, which acknowledges the deficiencies in Father's Rule 1925(a)(2) statement but nevertheless addresses the claims that can be construed therein. Furthermore, we may discern the gist of Father's claims. Accordingly, we decline to dismiss this appeal and will review his claims.

### III. Merits Review of Custody Ruling

As stated above, Father's brief consists of numbered sentences, which aver the following. He wishes to remain a part of Child's life, perhaps with the involvement of Children and Youth Services, and would like to know about

Child's welfare, schooling, and health. Father's Brief at 1, 3 (unpaginated). Father "has always been a good and loving father to his son," he "has no quarrels with [M]other and doesn't understand why being a part of the child's life would be a problem," he "never gave up his parental rights" and it was Mother who "decided on her own[ ] to keep [Father] out of her son[']s life." *Id.* at 1-2. Father's criminal case "has nothing to do with him being a father to his child." *Id.* at 2. Father "feels . . . betrayed by the courts," and "[t]he court has not granted anything on behalf of [him,] who is showing that he cares, but allowing [M]other to be a burden to [Father] because of some kind of ill will that she is feeling, which doesn't include the child [sic]." *Id.* at 2-3. We conclude no relief is due.

We review a custody order for an abuse of discretion. *V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012). We must accept the court's factual findings if the record supports them, though we need not accept the court's deductions or inferences from its findings. *Id.* In custody matters involving a hearing officer, the court must independently review the record to determine whether the hearing officer's findings and recommendations are appropriate. *K.B. v. M.F.*, 247 A.3d 1146, 1150 (Pa. Super. 2021) (citation omitted). "Although advisory, the hearing officer's report and recommendations are given the fullest consideration particularly on the issue of credibility of witnesses, which the trial court is not empowered to second-guess." *Id.* (citation omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." ***S.W.D. v. S.A.R.***, 96 A.3d 396, 400 (Pa. Super. 2014). Section 5328(a) of the Child Custody Act sets forth the factors that a trial court must consider when awarding custody:

> **(a) Factors.—**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

> (3) The parental duties performed by each party on behalf of the child.

> (4) The need for stability and continuity in the child's education, family life and community life.

> (5) The availability of extended family.

> (6) The child's sibling relationships.

> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.

> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a)(1)-(16).

Additionally, Section 5329 directs that a trial court must consider whether a party seeking custody, or a member of that party's household, has been convicted of certain criminal offenses. The statute provides that a court may not award custody if a party poses a threat of harm to the child:

**(a) Offenses.—**Where a party seeks any form of custody, the court shall consider whether that party or member of that party's household has been convicted of or has pleaded guilty or no contest to any of the offenses in this section or an offense in another jurisdiction substantially equivalent to any of the offenses in this section. The court shall consider such conduct and

- 12 -

determine that the party does not pose a threat of harm to the child before making any order of custody to that party when considering the following offenses:

\*     \*     \*

18 Pa.C.S. § 3125 (relating to aggravated indecent assault).

\*     \*     \*

18 Pa.C.S. § 4304 (relating to endangering welfare of children).

\*     \*     \*

18 Pa.C.S. § 6301 (relating to corruption of minors).

\*     \*     \*

23 Pa.C.S. § 5329(a).

Finally, a trial court should consider certain additional factors if a case involves a potential award of custody to an incarcerated parent. These factors include:

(1) age of the child; (2) distance and hardship to the child in traveling to the visitation site; (3) the type of supervision at the visit; (4) identification of the person(s) transporting the child and by what means; (5) the effect on the child both physically and emotionally; (6) whether the parent has and does exhibit a genuine interest in the child; and (7) whether reasonable contacts were maintained in the past. Of course, . . . another relevant consideration is the nature of the criminal conduct that culminated in the parent's incarceration[.]

**M.G. v. L.D.**, 155 A.3d 1083, 1094 (Pa. Super. 2017) (citation omitted).

In its March 30, 2020, report and recommendation, the master analyzed the Subsection 5328(a) factors and the Section 5329 factors regarding incarcerated parents. Report & Recommendation of Master, 3/30/20, at 6-10. The master further analyzed whether Father posed a threat a harm to

Child under Section 5329. *Id.* at 10-11. Importantly, the court found Father does present a threat of harm to Child, due to his past abusive conduct and heinous criminal convictions. *Id.* at 7-11. The master also found credible Mother's testimony that contact with Father would cause Child mental anguish. *Id.* at 6, 10.

Our review of the record supports the master's report and the trial court's decision. As discussed above, the record indicates Father is serving a sentence of 13½ to 29 years' incarceration, resulting from convictions of aggravated indecent assault of a child, corruption of minors, and endangering the welfare of a child. N.T. at 10, 13-15. These crimes were committed against his step-daughter, who was entrusted in his care. *Id.* at 24 (Father committed the sexual abuse on overnight visits, when Mother was working an overnight shift). Father has had no contact with Child since March 2011. *Id.* at 13. In addition, Mother testified that Father's last contact with Child involved Father pulling Child out of Mother's car and putting his hands around Child's neck. *Id.* at 17. This incident led to Mother obtaining a PFA order against Father, which Father violated repeatedly, incurring first probation and then incarceration. *Id.* at 18-20.

Moreover, Mother testified that contact with Father would be harmful to Child. Child required therapy after Father's incarceration because he felt somehow responsible for Father's actions and still maintains a sense of guilt. *Id.* at 20, 33-34. Mother further explained Child has a close relationship with

the victim of Father's crimes, and she contended forcing Child to have contact with Father would be "terrible" for Child due to the guilt he would experience and the feeling of "betraying" the victim. *Id.* at 21-22, 25-27, 33. It was within the master's discretion to accept Mother's testimony as credible. *See* ***K.B.***, 247 A.3d at 1150.

Father does not challenge any of these findings, nor does he present any argument with respect to any specific statutory finding. Instead, he merely repeats, broadly, his desire to have telephone and letter communication with Child, and to receive information about Child's well-being, schooling, and health. Significantly, while Father vaguely asserts that his criminal matter "has nothing to do with him being a father to his child," Father wholly fails to address that he sexually abused a child who was in a step-child role to him, while she was entrusted in his care.

Based on the foregoing, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/30/2021